## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

**SERING CEESAY,**

*Petitioner-Plaintiff,*

**v.**

**THOMAS BROPHY,** in his official capacity as Acting Field Office Director, Buffalo Field Office, Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement, U.S. Department of Homeland Security; **MICHAEL BALL,** in his official capacity as Warden, Buffalo Federal Detention Facility; **WILLIAM JOYCE,** Acting New York Field Office Director for U.S. Immigration and Customs Enforcement; **KRISTI NOEM,** in her official capacity as Secretary, U.S. Department of Homeland Security; **U.S. DEPARTMENT OF HOMELAND SECURITY**; and **U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,**

*Respondents-Defendants.*

Civil Action No.:

**Verified Petition for Writ of Habeas Corpus and Complaint for Injunctive Relief**

*Oral Argument Requested*

## INTRODUCTION

1. This case is about Sering Ceesay ("Petitioner" or "Mr. Ceesay"), who is currently detained in the custody of the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE) at the Buffalo Federal Detention Facility ("BFDF") and was detained without any notice or an opportunity to respond by ICE on or about February 19, 2025.

2. Mr. Ceesay is sixty-three (63) years old and has lived in the United States for nearly three decades. He is not fully literate-he has limited reading and writing ability because he never

1

attended school. Prior to his unnoticed detention, he lived in the Bronx, New York in the same

apartment for nearly three decades.  He suffers from a myriad of serious and chronic medical

issues.  *See* Exh.1, Letter from Dr. Joseph Shin, MD, MSc, Assistant Professor of Medicine,

Division of Hospital Medicine, Cornell Center for Health Equity ("Shin Medical Letter").[1]

The Shin Medical Letter explains as follows:

> Mr. Ceesay is a is a 63-year-old man with a history of hypertension, hyperlipidemia,
> pre-diabetes, coronary artery disease with 2 past heart attacks/myocardial infarctions
> requiring urgent stenting of his narrowed coronary artery stenting on two occasions
> (2016 with 3 stents deployed, and 2024 with 1 stent deployed). He also has chronic
> symptomatic peripheral artery disease and claudication (recurrent leg pain due to
> limited blood flow in the arteries of the lower extremities, narrowed due to
> cholesterol/atherosclerotic plaque), chronic heart failure, and a recent hospitalization,
> March 4-5, 2025, for a transient ischemic attack (a temporary stroke-like syndrome due
> to atherosclerotic plaque in the blood vessels of the brain), and MRI brain evidence of
> chronic cerebrovascular disease.

3. Section 504 of the Rehabilitation Act ("Section 504") prohibits discrimination on the basis of

disability in programs or activities conducted by executive agencies of the United States. 29

U.S.C. § 794.  This provision not only incorporates key language from the Civil Rights Act of

1964 but goes further—it imposes an affirmative obligation on public entities to reasonably

modify their rules, policies and practices, in order to make benefits, services and programs

accessible to people with disabilities. *See Disabled in Action v. Bd. of Elections in City of New

York*, 752 F.3d 189, 196–97 (2d Cir. 2014).

4. Mr. Ceesay arrested by ICE without any notice or warning when he appeared for regularly

scheduled check-in with ICE on or about February 19, 2025, at 26 Federal Plaza, New York,

---

[1] The Shin Medical Letter has a redaction pursuant to Federal Rule of Civil Procedure 5.2-
redaction of Petitioner's date of birth.

NY 10278.  Mr. Ceesay has been checking with ICE at 26 Federal Plaza, New York, NY 10278

since in or about 2010.[2]  He has been detained at BFDF since or about February 20-21, 2025.

5.  At the time of his unnoticed detention on or about February 19, 2025, Mr. Ceesay did not have

any of his medication and/or medical information.  Mr. Ceesay believed that-as has been the

case since in or about 2010-he would check-in and return home where he would be able to take

his medication and continue receiving ongoing medical at Jacobi Hospital in the Bronx, New

York.  As explained in the Shin Medical Letter, "Mr. Ceesay's severe chronic medical

problems have been successfully managed due to his access to routine as well as emergency

access to specialized cardiac and neurologic services.  He was able to survive his prior to heart

attacks and his recent transient ischemic attacks due to his access to care.  His future risk of

worsening heart disease, stroke, and death are mitigated by his access to routine care as well

as the regimen of multiple medications."

6.  Mr. Ceesay was alone when he checked in with ICE.  RFK Human Rights met Mr. Ceesay

during a pre-approved legal rights presentation at the BFDF on March 4, 2025. Mr. Ceesay

came to the legal rights presentation with other people in his unit at BFDF.  RFK Human Rights

---

[2] Because Mr. Ceesay was detained by ICE without any prior notice or warning, he did not have any paperwork with him regarding his immigration case and did not have any of his medication and or his medical documents.  At the time of his detention by ICE on or about February 19, 2025, Mr. Ceesay's OSUP paperwork was taken from him.  RFK Human Rights made a request to ICE March 11, 2025 for any and all legal documents and provided an ICE Privacy Waiver and G28-notice of entry appearance before ICE.  On March 25, 2025, ICE transmitted to RFK Human Rights a total of six (6) pages of legal documents. The 6 pages consist of a voluntary departure order from 1997 and an Order to Show Cause that appears to have commenced immigration removal proceedings against Mr. Ceesay in 1995.  RFK Human Rights was advised by ICE that any other legal documents will have to be request through Freedom of Information Act (FOIA) request despite the fact that an ICE Privacy Waiver was served on the government on March 11, 2025 and permits the disclosure of Petitioner's alien file.  A FOIA request would not be responded to an expeditious manner and therefore RFK Human Rights served an ICE Privacy Waiver. ICE did not provide a copy of the OSUP.  *See* Exh. 2, Documents Provided by ICE.

met with Mr. Ceesay briefly following the legal rights presentation because he appeared to be in medical distress and therefore RFK Human Rights requested that he be taken to the medical unit. He was taken to the BFDF medical unit and then taken to an outside hospital.

7.  To the extent that Respondents revoked Mr. Ceesay's OSUP without prior notice or opportunity to be heard, Respondents have acted in violation of statute, regulations, and the U.S. Constitution. Moreover, Mr. Ceesay was-as is discussed *infra*-entitled to accommodations. Section 504 requires that reasonable accommodations be made for Mr. Ceesay's physical disability in connection with his OSUP and immigration proceedings.

8.  To comport with due process, immigration detention must bear a reasonable relationship to its two regulatory purposes: ensuring the appearance of noncitizens at future hearings and preventing danger to the community pending the completion of removal. *See Zadvydas v. Davis*, 533 U.S. 690, 691 (2001). Here, despite no changed circumstances regarding either flight risk or public safety, ICE nevertheless detained Mr. Ceesay without notice, a hearing, or even an interview. *See Rombot v. Souza*, 296 F. Supp. 3d 383, 388–89 (D. Mass. 2017) (finding a due process violation and explaining that ICE "never asserted that Rombot is a danger to the community or a flight risk, or that he violated the conditions of his [OSUP]. . . . The Supreme Court has recognized that a 'alien may no doubt be returned to custody upon a violation of [supervision] conditions,' but it has never given ICE a carte blanche to re-incarcerate someone without basic due process protection.") (quoting *Zadvydas*, 533 U.S. at 700).

9.  It has long been settled in the Second Circuit that immigration authorities are required to adhere to their own regulations. *See Montilla v. I.N.S.*, 926 F.2d 162, 169 (2d Cir. 1991). Drawing on the doctrine set forth by the Supreme Court in another immigration case, *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266–67 (1954), the Second Circuit held that where an

agency has promulgated a regulation impacting individual rights, "fundamental notions of fair play underlying the concept of due process" require that the agency adhere to that regulation. *Montilla*, 926 F.2d at 167.

10. The government's actions against Mr. Ceesay also violate the APA. The APA permits persons to challenge final agency actions in the federal courts. 5 U.S.C. §§ 702, 704, 706. Final agency action can be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A)–(B). The government's actions in detaining Mr. Ceesay without any notice or warning and under the circumstances that exist in this case violate the APA.

11. Adherence to the Constitution and regulations is of utmost importance in this case because there was no neutral judicial oversight of ICE's unnoticed detention of Mr. Ceesay on or about February 19, 2025.[3]   In the somewhat analogous context of parole revocation, the Supreme Court has held that "due process requires that after the arrest, the determination that reasonable ground exists for revocation of parole" should be made by an "independent officer" who is "not directly involved in the case." *Morrissey v. Brewer*, 408 U.S. 471, 485 (1972); *see also*

---

[3] In the United States legal system, prompt neutral judicial review is available to determine the propriety of an arrest. *See, e.g.*, *Gerstein v. Pugh*, 420 U.S. 103, 112 (1975) ("To implement the Fourth Amendment's protection against unfounded invasions of liberty and privacy, the Court has required that the existence of probable cause be decided by a neutral and detached magistrate whenever possible."); *see also id.* at 114 (observing that "[a]t common law, it was customary, if not obligatory, for an arrested person to be brought before a justice of the peace shortly after arrest" and that this became a model for a "reasonable" seizure under the Fourth Amendment). Whereas an arresting officer is predisposed to believe that an arrest he has made is justified, a neutral magistrate's sober assessment of the propriety of that arrest is uncolored by such bias. *See, e.g., Gerstein*, 420 U.S. at 118; *see also United States v. U.S. Dist. Court for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 316–17 (1972) ("[E]xecutive officers of Government['s] duty and responsibility are to enforce the laws, to investigate, and to prosecute. But those charged with this investigative and prosecutorial duty should not be the sole judges of when to utilize constitutionally sensitive means in pursuing their tasks.").

*United States v. Sanchez*, 225 F.3d 172, 175 (2d Cir. 2000) (in context of revocation of supervised released, requiring notice and opportunity to be heard by neutral hearing body). ICE has no process for bringing individuals re-detained following release on an OSUP before a neutral magistrate for an assessment of the propriety of their detention. Therefore, ICE's actions must scrupulously conform to the governing regulations, constitutionally construed.

12. Mr. Ceesay brings this action to seek injunctive, habeas and declaratory relief ordering Respondents to release him.  Mr. Ceesay's ongoing detention-the purpose of which is to remove him from the United States-flow from his unlawful detention or about February 19, 2025.

13. The power of the government to detain and deport immigrants is not without limitations. To the contrary, the power of government to act is delineated by a specific set of statutes and federal regulations, and subject to the limitations of the United States Constitution. ICE's violation of its own regulations, designed to protect the liberty interests of individuals who were deemed to lack flight risk or dangerousness, merits reversal of the revocation and restoration of Mr. Ceesay's authorization to live in the United States. and, at minimum, the opportunity for an orderly departure.

**PARTIES**

14. Mr. Ceesay has lived in the United States for nearly three decades. Prior to his unnoticed detention on or about February 19, 2025, he was residing in the Bronx, New York.  As is set forth in the Shin Medical Letter, Mr. Ceesay suffers from complex medical conditions and was, prior to his unnoticed detention on or about February 19, 2025, receiving ongoing and critical medical care at the Jacobi Hospital in the Bronx, New York.

15. Respondent-Defendant Thomas Brophy is the Acting Field Office Director for the Buffalo Field Office of ICE Enforcement and Removal Operations. He is sued in his official capacity only. Acting Field Office Director Brophy is charged with exercising authority over the removal operations carried out by ICE in the Buffalo geographic region, which includes the BFDF, and for determinations on whether and where Petitioner-Plaintiff is to be detained prior to removal.

16. Respondent-Defendant Michael Ball is sued in his official capacity as Warden of the BFDF, the ICE facility at which Petitioner is currently detained.

17. Respondent-Defendant William Joyce is named in his official capacity as the acting New York Field Officer Director for U.S. Immigration and Customs Enforcement within the United States Department of Homeland Security ("DHS").  In this capacity, he is responsible for the administration of immigration laws and the execution of detention and removal determinations and is legal custodian of Petitioner.  Respondent-Defendant's Joyce's address is 26 Federal Plaza, 9th Floor, New York, New York 10278. Upon information and belief, Respondent-Defendant's Joyce is charged with exercising authority over the ICE's New York Field Office including, but not limited to, the detention of Mr. Ceesay.

18. Respondent-Defendant, Kristi Noem, is named in her official capacity as the Secretary, U.S. Department of Homeland Security. In this capacity, she is responsible for overseeing ICE's day-to-day operations, leading approximately 20,000 ICE employees, including Respondent Brophy.

19. Respondent-Defendant U.S. Department of Homeland Security ("DHS") is an executive department of the United States Government headquartered in Washington, D.C. DHS is the parent agency of ICE.

7

20. Respondent-Defendant ICE is a component agency of DHS and is responsible for enforcing federal immigration law, including the detention and removal of immigrants.

## JURISDICTION AND VENUE

21. This Court has jurisdiction under the U.S. Constitution. U.S. Const. art. I § 9, cl. 2 ("The privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require.").

22. The Court also has jurisdiction under 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1651 (the All Writs Act); 28 U.S.C. § 2241 (habeas corpus); and 5 U.S.C. § 701 (the Administrative Procedure Act).

23. This Court has additional remedial authority under 28 U.S.C. §§ 2201-02 (the Declaratory Judgment Act), to grant injunctive and declaratory relief.

24. Venue is proper in the U.S. District Court for the Western District of New York because Respondents-Defendants are officers of United States agencies, Mr. Ceesay currently resides within this District, and there is no real property involved in this action. *See* 28 U.S.C. § 1391(e)(1).

## RELEVANT FACTS AND PROCEDURAL HISTORY

25. Mr. Ceesay is 63 years old and came to the United States when he was about twenty-eight (28) years old. Mr. Ceesay is from the Gambia and has not returned there since his entry to the United States. Mr. Ceesay has limited ability to read and write because he never attended any school and was raised by his grandmother who was also illiterate.

26. Upon information and belief, Mr. Ceesay has a final order of removal that was entered in or about 1997.  Mr. Ceesay was based upon the documents provided by ICE granted voluntary departure in 1997 and upon information and belief the voluntary departure order automatically converted to a final order of removal in or about 1997. *See* Exh. 2, Documents Provided by ICE.

27. In or about 2010, ICE came to Mr. Ceesay's home in the Bronx, New York and left a phone number of him to call.  Mr. Ceesay called the number left by ICE and was told that he had to meet them at the 47th Precinct for the New York City Police Department in the Bronx, New York.   The 47th Precinct is located about fifteen (15) minutes from Mr. Ceesay's home and so he walked there to meet with ICE on the date and time he was told.

28. When Mr. Ceesay arrived at the 47th Precinct on the date and time he was told to by ICE in 2010, ICE detained him.  ICE did not advise Mr. Ceesay that he would be detained.  Mr. Ceesay was brought first to ICE's offices at 26 Federal Plaza in Manhattan and thereafter was taken to a jail in New Jersey that was being used to house people in ICE custody. Mr. Ceesay remained in the jail in New Jersey for approximately three months and then he was released on an OSUP in or about 2010.

29. From his release on an OSUP in or about 2010 until on or about February 19, 2025, Mr. Ceesay checked-in with ICE in Manhattan as directed.

30. On or about February 19, 2025, Mr. Ceesay was detained without notice or warning. Mr. Ceesay was detained on or about February 19, 2025, after being yelled at by an ICE Officer who was upset with Petitioner that he did not have a passport.  Mr. Ceesay was never previously advised that he had to bring a passport.   Mr. Ceesay is not literate and upon

information and belief the OSUP and/or any other documents provided to him by ICE in connection with his OSUP were not read to him.

31. The ICE Officer, enraged at Mr. Ceesay, yelled that he was going to be put in handcuffs and taken to jail for two months. Two other ICE Officers then took Mr. Ceesay to another floor at 26 Federal Plaza where he was processed.

32. After a while, Mr. Ceesay was taken by ICE Officers to a van, placed in the back of the van in handcuffs and taken to Orange County Jail in Goshen, New York.   Mr. Ceesay stayed overnight at the Orange County Jail in Goshen, New York and then was picked up in the morning by ICE Officers, placed in a van and taken a jail in Nassau County New York.

33. Mr. Ceesay was at the jail in Nassau County New York, upon information and belief, for approximately twenty-four (24) hours. While there a medical professional at the jail in Nassau County checked Mr. Ceesay and determined that he was not medically cleared to remain at the facility.

34. Upon information and belief, the jail in Nassau County that Mr. Ceesay was taken to was being used-in part-by ICE to house people in ICE custody. Mr. Ceesay has *never* been arrested in the United States other than the two times-in or about 2010 and most recently on or about February 19, 2025-by ICE.

35. Mr. Ceesay was then taken from the Nassau County Jail back to 26 Federal Plaza where the same ICE Officer who ordered him to be detained, was angry to see him back.  The ICE Officer yelled and then Mr. Ceesay was taken to a van, placed in handcuffs in the back of the van and taken to the BFDF where he remains as of the date of this Petition.

36. As is set forth *supra,* Mr. Ceesay did not have legal counsel at the time of his unnoticed detention by ICE on or about February 19, 2025 and did not meet with legal counsel until RFK

Human Rights met him on March 4, 2025 during a pre-scheduled legal presentation at the BFDF.

37. As is also set forth *supra,* at the time RFK Human Rights met with Mr. Ceesay on March 4, 2025, he was in visible medical distress. RFK Human Rights requested that Mr. Ceesay go to the medical unit.  Mr. Ceesay was sent from the medical unit on March 4, 2025 to an outside of medical provider.  Mr. Ceesay suffered "a transient ischemic attack (a temporary stroke-like syndrome due to atherosclerotic plaque in the blood vessels of the brain)." *See* Exh. 1, Shin Medical Letter.

38. On March 11, 2025, RFK Human Rights sent an email to ICE that requested *inter alia* any and all documents related to Mr. Ceesay's immigration proceedings including but not limited to any and all documents that were served upon him at the time of his detention by ICE and that have been served upon him since the time of his detention at BFDF.  RFK Human Rights also requested any and all medical records for Mr. Ceesay and to be provided notice of any and all meetings with ICE and consulates.

39. RFK Human Rights sent email follow-ups to ICE on March 13, 2025, March 14, 2025, March 17, 2025 and March 18, 2025.

40. On March 19, 2025, RFK Human Rights had a pre-scheduled legal call with Mr. Ceesay but was advised that he was not available due to an interview with a consulate.  RFK Human Rights sent an urgent request to the Assistant Field Office Director and copied an Assistant United States Attorney for the Western District of New York to request that counsel be present at the interview the consulate.  Neither RFK Human Rights nor Mr. Ceesay were given any prior notice of the interview the consulate despite emails that repeatedly requested that counsel be given notice and an opportunity to be present.

41. RFK Human Rights was thereafter permitted to be present at the interview with the consulate and requested the meeting be adjourned so that RFK Human Rights could be provided with legal documents and any documents that were being presented to Mr. Ceesay by the consulate. Mr. Ceesay cannot read or write.   The consulate, over the objection of ICE, agreed to adjourn to the meeting.

42. On March 19, 2025, RFK Human Rights sent an email to ICE confirming that the consulate appointment was rescheduled and confirming that ICE would provide the legal documents that have been requested since March 11, 2025.  RFK Human Rights also requested a copy of a "travel document" that an ICE Officer who was present for the consulate interview referenced. As is set forth *supra,* Mr. Ceesay has only been in ICE custody twice-in or about 2010 and on or about February 19, 2025 when he was detained. Mr. Ceesay was never advised that there was a "travel document".

43. ICE's position is that RFK Human Rights as counsel for Mr. Ceesay and Mr. Ceesay cannot be provided with the "travel document" referenced by the ICE Officer on March 19, 2025 because the "travel document" is not a legal document.

44. On March 20, 2025, ICE advised that RFK Human Rights as counsel for Mr. Ceesay would receive the legal documents at least one day before the consulate interview on March 26, 2025.

45. On March 25, 2025, ICE transmitted to RFK Human Rights a total of six (6) pages of legal documents. ICE did not provide a copy of the OSUP.  *See* Exh. 2, Documents Provided by ICE.

46.  Upon information and belief, Mr. Ceesay-other than his current detention by ICE and prior detention by ICE in 2010-has never been arrested or incarcerated in the more than three decades that he has resided in the United States.

## LEGAL FRAMEWORK

47. Respondents purported basis for re-detaining Mr. Ceesay is 8 U.S.C. §1231. ICE's authority to release people from detention is governed by 8 U.S.C. § 1231(a)(3), which grants ICE authority to release an individual "subject to supervision."

48. Federal regulations specify that ICE may only release such individuals if they "demonstrate[] to the satisfaction of the Attorney General . . . that his or her release will not pose a danger to the community or to the safety of other persons or to property or a significant risk of flight pending such alien's removal." 8 C.F.R. § 241.4(d). These requirements—flight risk and danger—reflect constitutional constraints, since only individuals who pose a flight risk or danger may be civilly detained. *See Zadvydas v. Davis*, 533 U.S. 690 (2001).

49. Mr. Ceesay, having been released on an OSUP pursuant to this process, was therefore deemed by Respondents to lack flight risk or dangerousness.

50. To comport with due process, detention must bear a reasonable relationship to its two regulatory purposes—to ensure the appearance of noncitizens at future hearings and to prevent danger to the community pending the completion of removal. *Zadvydas*, 533 U.S. at 690-691 (2001).

51. ICE determined that Mr. Ceesay is neither a flight risk nor a danger when they granted him an OSUP in 2010. Since that date, Respondent's circumstances have not changed, and he has remained in compliance with the OSUP.

52. Procedural due process constrains governmental decisions that deprive individuals of property or liberty interests within the meaning of the Due Process Clause of the Fifth Amendment. Because Mr. Ceesay's detention on February 19, 2025, lacked the procedural protections that such a significant deprivation of liberty requires under the Due Process Clause of the Fifth

Amendment to the U.S. Constitution, her continued detention is unlawful. *See Mathews,* 424 U.S. at 332 (1976); *see also Perry v. Sindermann*, 408 U.S. 593, 601-03 (1972) (reliance on informal policies and practices may establish a legitimate claim of entitlement to a constitutionally protected interest). Infringing upon a protected interest triggers a right to a hearing before that right is deprived. *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569-70 (1972).

53. The revocation of Mr. Ceesay's release does not satisfy the minimum requirements of due process, because that revocation is not the product of any individualized review and alleges no relevant change in circumstances altering the original assessment of his risk of flight. *See Rombot,* 296 F. Supp. 3d at 388. *See also, Torres-Jurado v. Biden,* 2023 U.S. Dist. LEXIS 193725 at *12 (S.D.N.Y. Oct. 29, 2023) (stating that "due process, at a minimum" requires the government to afford meaningful notice and an opportunity to be heard and that the opportunity must be meaningful) (citing *Ying Fong v. Ashcroft*, 317 F. Supp. 2d 398, 403 (S.D.N.Y. 2004)).

54. The government's presumed basis for re-detaining Mr. Ceesay is 8 U.S.C. § 1231, the statute governing detention following a final order of removal ("post-order detention"). Under the terms of this statute and the governing regulations, Mr. Ceesay's detention is unlawful.

55. The INA specifies circumstances upon which a person may be released from custody, and it does not provide for re-detention except impliedly for a violation of those terms. The relevant regulatory framework (8 C.F.R. §§ 241.4(l) and 241.13(i)) authorizes revocation of an individual's release on an OSUP only in certain contexts. Section 241.4(l) specifies revocation may occur upon violation of the conditions of release or when, in the district director's opinion, revocation is in the public interest because one of four conditions is met: "(1) the purposes of

14

release have been served; (2) the alien violates any condition of release; (3) it is appropriate to enforce a removal order or to commence removal proceedings against an alien; or (4) the conduct of the alien, or any other circumstance, indicates that release would no longer be appropriate." 8 C.F.R. § 241.4(l)(2). Section 241.13(i) provides further conditions where release decisions may be revoked, only for the purpose of removal. Notably, several of these provisions are found only in the regulations and not the statute and are ultra-vires, but even to the extent they apply, Respondents have failed to comply with the process.

56. 8 U.S.C. § 1231 authorizes the detention of individuals following a final order of removal only under specifically delineated circumstances. The third subclause of 8 U.S.C. § 1231(a)(3) provides that an individual who is not removed within a 90-day statutory removal period "*shall* be subject to supervision" (emphasis added) under specific terms, including requirements that he or she appear periodically before an immigration officer and obey any written restrictions. *See also* 8 C.F.R. § 241.5 (specific conditions for release—involving but not limited to reporting requirements and travel document acquisition requirements—should an order of supervision be issued).

57. Mr. Ceesay has, at minimum, a regulatory right to a detailed explanation for the reasons of revocation as well as an interview to contest the basis for the revocation. At a minimum, ICE "has the duty to follow its own federal regulations." *Haoud v. Ashcroft*, 350 F.3d 201, 205 (1st Cir. 2003) (quoting *Nelson v. I.N.S.*, 232 F.3d 258, 262 (1st Cir. 2000)). It has failed to do so here.

58. When the government fails to comply with its own federal regulations, as it did when it revoked Mr. Ceesay's release in violation of its own procedures, the action should be found invalid. *See Rombot*, 296 F. Supp. 3d at 388.

59. Moreover, under the APA, "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." 5 U.S.C. § 704. The reviewing Court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence." 5 U.S.C. §§ 706(2)(A), (E).

60. The decision to detain Mr. Ceesay, who had previously been released on an OSUP, and neither violated nor failed to comply with the OSUP must be reviewed by this Court and found to be "arbitrary, capricious, an abuse of discretion and not in accordance with the law." 5 U.S.C. §§ 706(2)(A), (E). Absent this Court's intervention, Mr. Ceesay does not have any "remedy" to challenge the decision of Respondents. *See Torres-Jurado,* 2023 U.S. Dist. LEXIS 193725 at *14 (finding that "[a]lthough procedural requirements can seem like a mere formality, they promote 'agency accountability' and ensure that the parties—and where relevant, the public—can respond fully and in a timely manner to an agency's exercise of authority.") (citing *Bd. of Regents of State Colleges,* 140 S. Ct. 1891).

61. Under Section 504, a federally funded agency illegally discriminates against individuals with disabilities when it fails to provide "meaningful access" to its benefits, programs, or services. *Alexander v. Choate*, 469 U.S. 287, 301 (1985); *Disabled in Action*, 752 F.3d at 197; *see also Tennessee v. Lane*, 541 U.S. 509, 531 (2004). Individuals are entitled to accommodation under Section 504 if they have a disability—a "physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1).

62. An agency can fail to provide meaningful access not only through intentional exclusion, but also by "failure to modify existing facilities and practices." *Disabled in Action*, 752 F.3d at 197; *see also Choate*, 469 U.S. at 297. Section 504 requires federally funded programs to

16

remedy a lack of meaningful access by providing "reasonable accommodation." *Disabled in Action*, 752 F.3d at 197; *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272–73 (2d Cir. 2003). A proposed accommodation is reasonable if it does not fundamentally alter the nature of the federal program or impose an undue hardship. *See id.* at 281.

63. Reasonable accommodations should have been afforded Mr. Ceesay in connection with his OSUP and immigration proceedings. It would not have been a "fundamental alteration" nor an "undue financial or administrative burden" for ICE to follow the law, not detain Mr. Ceesay without notice or warning on or about February 19, 2025 and not act in a manner that completely disregarded the fact that he is a disabled individual. *Alexander*, 469 U.S. 287, 299-300, 302 n.21 (1985); *see also* 28 C.F.R. § 35.130(b)(1)(7)(i); 28 C.F.R. § 35.150(a)(3); 6 CFR § 15.30 and § 15.50. It is the government's burden to prove that an accommodation is not necessary because it either poses a "fundamental alteration" or "undue financial or administrative burden." *Id.* A fundamental alteration is one that changes an "essential aspect" of the program. *Cf. PGA Tour, Inc. v. Martin, 532 U.S. 661-663* (2001) (discussing the distinction between a fundamental alteration and peripheral features of a program for a disabled golfer requesting the use of a golf cart). *See also,* In *Henrietta D. v. Giuliani*, 119 F. Supp. 2d 181, 212 (E.D.N.Y. 2000), *aff'd sub nom. Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003) a district court held, and the Second Circuit affirmed, that "intensive case management and low case manager-to-client ratios" and other similar reasonable modifications were required to ensure people with HIV had meaningful access to the same benefits and services others received. Both the district court and the court of appeals expressly rejected the claim that these management modifications constituted "additional benefits, or better benefits, than the non-disabled receive, which the law does not compel." Rather, they were reasonable

modifications "required to ensure meaningful access to the same benefits and services" as non-disabled people received.

## CLAIMS FOR RELIEF

### COUNT I:

### MR. CEESAY'S DETENTION VIOLATES THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE BECAUSE IT BEARS NO REASONABLE RELATIONSHIP TO ANY LEGITIMATE PURPOSE

64. Petitioner realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

65. To comport with due process, detention must bear a reasonable relationship to its two regulatory purposes—to ensure the appearance of noncitizens at future hearings and to prevent danger to the community pending the completion of removal. *Zadvydas*, 533 U.S. at 690-691.

66. Petitioner is neither a danger nor a flight risk. The detention of Petitioner is arbitrary on its face.

67. Mr. Ceesay has dutifully complied with every condition of his OSUP and no change in circumstances exists to warrant the revocation of his OSUP.

68. Because Petitioner's detention has been unaccompanied by the procedural protections that such a significant deprivation of liberty requires under the Due Process Clause of the Fifth Amendment to the U.S. Constitution, his continued detention is unlawful.

### COUNT II:

### MR. CEESAY'S DETENTION VIOLATES THE INA, REGULATIONS THEREUNDER, AND THE FIFTH AMENDMENT DUE PROCESS CLAUSE BECAUSE HE HAS BEEN RELEASED ON A VALID ORDER OF SUPERVISION

69. Petitioner realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

18

70. Respondents' presumed basis for re-detaining Petitioner is 8 U.S.C. § 1231, the statute governing detention following a final order of removal ("post-order detention").

71. Under the terms of this statute and the governing regulations, Petitioner's detention is unlawful.

## COUNT III:

### MR. CEESAY'S RE-DETENTION BY RESPONDENTS VIOLATES THE APA AND THE *ACCARDI* DOCTRINE

72. Petitioner realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

73. The APA provides that a court "shall . . . hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). When the government has promulgated "[r]egulations with the force and effect of law," those regulations "supplement the bare bones" of federal statutes, such that the agencies are bound to follow their own "existing valid regulations." *United States ex rel. Accardi Shaugnessy*, 347 U.S. 260, 266, 268 (1954). The *Accardi* doctrine also obligates agencies to comply with procedures it outlines in its internal manuals. *See Morton v. Ruiz*, 415 U.S. 199, 235 (1974) (finding that an agency is obligated to comply with procedural rules outlined in its internal manual).

74. To the extent that Respondents have revoked Mr. Ceesay's OSUP without notice or an opportunity to be heard, they violated the statute and the applicable regulations–8 C.F.R. §§ 241.4(l) and 241.13(i)–by failing to provide him with a particularized notice of the reason(s) of the revocation of his release or an opportunity to respond to the allegations contained therein.

75. Mr. Ceesay has no adequate remedy at law.

## COUNT IV:

## MR. CEESAY'S RE-DETENTION BY RESPONDENTS VIOLATES THE APA, 5 U.S.C. § 706(2)

76. Petitioner realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

77. The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

78. Respondents' re-detention of Mr. Ceesay who was in full and complete compliance with his OSUP was arbitrary and capricious. Respondents failed to articulate a reasoned explanation for their decision in light of all available evidence.

79. A court reviewing agency action "must assess … whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment; it must "examine[e] the reasons for agency decisions- or, as the case may be, the absence of such reasons." *Judulang v. Holder*, 565 U.S. 42, 53 (2011) (quotations omitted).

80. Mr. Ceesay has no adequate remedy at law.

## COUNT V:

## VIOLATION THE REHABILITATION ACT § 504, 29 U.S.C. § 794

81. Petitioner realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

82. Section 504 requires that reasonable accommodations be made for Mr. Ceesay's disabilities in connection with his immigration proceedings.

83. To state a claim under the Rehabilitation Act, Mr. Ceesay must show that: "(1) he is a qualified individual with a disability; (2) the defendant is subject to one of the Acts; and (3) he was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant because of his disability." *Morales v. City of New York*, 2016 WL 4718189, at *7 (S.D.N.Y. Sept. 7, 2016) (citing *McElwee v. County of Orange*, 700 F.3d 635, 640 (2d. Cir. 2012)). "In addition, to recover under the Rehabilitation Act, 'a plaintiff must show that the defendants receive federal funding.'" *Id.* (citing *Henrietta D. v. Bloomberg,* 331 F.3d 261, 272 (2d Cir. 2003))

84. All four factors are met here. No serious dispute exists that Mr. Ceesay is a qualified individual with a disability under 6 C.F.R. 15.3(d)(1)(ii) in that he, and that Respondents are subject to the Rehabilitation Act and receives federal funding.

85. Section 504 requires that reasonable accommodations be made for Mr. Ceesay's disabilities in connection with his immigration proceedings. The government has violated Section 504 by subjecting Mr. Ceesay to re-detention rather than making reasonable modifications to its detention policy so as to avoid discrimination against individuals such as Petitioner who suffers from severe medical impairments.

### **PRAYER FOR RELIEF**

WHEREFORE, Petitioner requests that this Court:

a.     Exercise jurisdiction over this matter;

b.     Enjoin Petitioner's removal or transfer outside the jurisdiction of this Court and the United States pending its adjudication of this petition;

c.     Declare that Petitioner's detention violates the INA, regulations and the Due Process Clause of the Fifth Amendment because he has been released on an OSUP;

d.      Declare that the detention of Petitioner violates Section 504 of the Rehabilitation

Act, as it deprives Mr. Ceesay of a reasonable accommodation for his disabilities and is contrary

to law and regulations and order his immediate release;

e.      Order Petitioner's immediate release;

f.      Award Petitioner costs and reasonable attorneys' fees; and

g.      Order such other relief as this Court may deem just and proper.

//

                                        Respectfully Submitted,

                                        /s/ Sarah E. Decker
DATED:   March 26, 2025                  Sarah E. Decker
         New York, NY                    Staff Attorney
                                        1300 19th Street NW, Ste. 750
                                        Washington, DC 20036
                                        T: (646) 289-5593
                                        E: decker@rfkhumanrights.org

                                        /s/ Sarah T. Gillman
                                        Sarah T. Gillman
                                        Director of Strategic U.S. Litigation
                                        ROBERT F. KENNEDY HUMAN RIGHTS
                                        88 Pine St., 8th Fl., Ste. 801
                                        New York, NY 10005
                                        T: (646)289-5593
                                        E: gillman@rfkhumanrights.org

                                        *Attorneys for Petitioner-Plaintiff*

## 28 U.S.C. § 2242 VERIFICATION STATEMENT

I am submitting this verification on behalf of the Petitioner because I am one of the Petitioner's attorneys.  I have discussed with the Petitioner the events described in this Petition and Complaint.  On the basis of those discussions, I hereby verify that the statements made in this Petition and Complaint are true and correct to the best of my knowledge.

DATED:   March 26, 2025
         New York, NY

/s/ Sarah T. Gillman
Sarah T. Gillman
Director of Strategic U.S. Litigation
ROBERT F. KENNEDY HUMAN RIGHTS
88 Pine St., 8th Fl., Ste. 801
New York, NY 10005
T: (646)289-5593
E: gillman@rfkhumanrights.org

*Attorney for Petitioner-Plaintiff*