UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

SERING CEESAY,

               Petitioner,

      v.

STEVE KURZDORFER et al.,[1]

               Respondents.

_____

                          25-CV-267-LJV
                          DECISION & ORDER

This case raises the question of whether a noncitizen subject to a final order of removal and released on an order of supervision is entitled to due process when the government decides—in its discretion—to revoke that release. The Court answers that question simply and forcefully: Yes. Noncitizens, even those subject to a final removal order, have constitutional rights just like everyone else in the United States. *See Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). And while the United States Department

_____

[1] The petition and amended petition each name six defendants: Thomas Brophy, in his official capacity as the Acting Field Office Director, Buffalo Field Office, Enforcement and Removal Operations, U.S. Immigration and Customs Enforcement ("ICE"), U.S. Department of Homeland Security ("DHS"); Michael Ball, in his official capacity as Warden of the Buffalo Federal Detention Facility ("BFDF"); William Joyce, Acting New York Field Office Director for ICE; Kristi Noem, in her official capacity as Secretary of DHS; DHS; and ICE. Docket Item 1 at 1; Docket Item 7 at 1. In its motion to dismiss, the government noted that Steve Kurzdorfer and Joseph Freden have succeeded Brophy and Ball as the Buffalo Field Office Director and as BFDF Warden, respectively. Docket Item 9-3 at 1. Therefore, under Federal Rule of Civil Procedure 25(d), Kurzdorfer and Freden are automatically substituted as defendants, and the Clerk of the Court shall update the case caption accordingly. *See* Fed. R. Civ. P. 25(d); *see also Wilder v. Shulkin*, 2017 WL 2889507, at *1 n.1 (S.D.N.Y. June 30, 2017) (noting that current Secretary of Veterans Affairs was automatically substituted for named defendant, former Secretary of Veterans Affairs, when latter was sued only in official capacity).

of Homeland Security ("DHS") might want to enforce this country's immigration laws efficiently, it cannot do that at the expense of fairness and due process. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266-68 (1954); *Torres-Jurado v. Biden*, 2023 WL 7130898, at *4 (S.D.N.Y. Oct. 29, 2023). As the framers recognized centuries ago, fair process—not just the correct outcome—matters. After all, without due process, there is no way to tell whether the result is in fact correct.

The petitioner in this case, Sering Ceesay, has been in DHS custody for more than two months. *See* Docket Item 7 at ¶ 1. On March 26, 2025, Ceesay filed a "[v]erified [p]etition for [a w]rit of [h]abeas [c]orpus and [c]omplaint for [i]njunctive [r]elief" challenging his detention, Docket Item 1; a few days later, he amended that pleading, Docket Item 7 (the "amended petition"). More specifically, Ceesay asks this Court to declare that his detention at the Buffalo Federal Detention Facility ("BFDF") in Batavia, New York, violates the Constitution, the Immigration and Nationality Act ("INA") and its related regulations, the Administrative Procedure Act ("APA"), and the Rehabilitation Act. Docket Item 7 at 20-24.[2] And based on that declaration, Ceesay requests his release via a writ of habeas corpus under 28 U.S.C. § 2241. Docket Item 7 at ¶ 23.

On April 4, 2025, the respondents moved to dismiss the amended petition for lack of jurisdiction and failure to state a claim. Docket Item 9. Ceesay then responded, Docket Item 12, and both sides filed several additional letters addressing the motion to dismiss, *see* Docket Items 13, 14, and 15. On April 10, 2025, the Court heard oral

---

[2] Page numbers in docket citations refer to ECF pagination.

argument and denied the government's motion to dismiss.[3]  Docket Item 17.  The Court also ordered the government to answer Ceesay's claims, and it scheduled a hearing on the amended petition.  *See* Docket Items 17 and 18.

The government filed an answer and supporting memorandum of law, Docket Items 19 and 19-6, opposing the relief sought in the amended petition and reiterating its arguments that the amended petition should be dismissed for lack of subject matter jurisdiction and failure to state a claim, Docket Item 19-6 at 14-24.  After Ceesay responded, Docket Item 25, the Court held an evidentiary hearing, *see* Docket Item 28.  Only two witnesses, Dr. Joseph Shin of Weill Cornell Medicine and Ceesay himself, testified.  *See id.*  Immediately after the hearing, the Court heard oral argument.  *See id.*  The Court then allowed both sides to submit supplemental briefing on their respective positions, *see id.*, and the parties filed those briefs, Docket Items 29 and 32.

For the reasons that follow, the Court grants Ceesay's amended petition in part and orders his release from custody.

## BACKGROUND[4]

Ceesay is a 63-year-old native of the Gambia who has lived in the United States—specifically, in the Bronx—for more than three decades.  Docket Item 7 at ¶ 2.

---

[3] The Court denied the motion on the record and said that its reasoning would be provided in a subsequent order.  That reasoning is discussed below.

[4] The following facts are taken from Ceesay's amended petition, Docket Item 7, and its attached exhibits, Docket Items 7-1 and 7-2.  Where noted, the Court also refers to Ceesay's ICE records submitted by the government, Docket Item 9-2; the government's answer, Docket Item 19; the declarations of ICE officers and Ceesay submitted by the parties before the hearing, Docket Items 19-1, 19-2, 19-3, 19-4, 19-5, and 25-1; the supplemental letter submitted by Dr. Shin, Docket Item 25-2; the testimony taken at the hearing held on April 23, 2025, Docket Item 27 (transcript of

He "never attended school" and has "limited reading and writing ability." *Id.*; *see also id.* at ¶ 42 (stating that Ceesay "cannot read or write").

Ceesay "suffers from a myriad of serious and chronic medical issues," *id.*, and he included with his petition a letter from a medical provider, Dr. Shin, *see id.* at ¶ 2; *see also* Docket Item 7-1 (letter). According to Dr. Shin, Ceesay has "a history of hypertension, hyperlipidemia, pre-diabetes, [and] coronary artery disease." Docket Item 7 at ¶ 2 (quoting Docket Item 7-1 at 1). He has suffered two "heart attacks/myocardial infarctions" that "requir[ed] urgent stenting of his narrowed coronary artery . . . on two occasions"—one in 2016 and one in 2024. *Id.* (quoting Docket Item 7-1 at 1). Ceesay "also has chronic symptomatic peripheral artery disease and claudication . . . , chronic heart failure,  . . . and MRI brain evidence of chronic cerebrovascular disease." *Id.* (quoting Docket Item 7-1 at 1). And he recently was hospitalized in March 2025 "for a transient ischemic attack," which is "a temporary stroke-like syndrome due to atherosclerotic plaque in the blood vessels of the brain." *Id.* (quoting Docket Item 7-1 at 1).

Ceesay's immigration proceedings have been going on in one form or another for decades. In September 1997, the government ordered Ceesay to "voluntar[il]y depart[]" by November 1997.[5] *Id.* at ¶ 27; Docket Item 7-2 at 1. The government told Ceesay

_____

proceeding); and the parties' stipulation of facts submitted in connection with that hearing, Docket Item 26.

[5] The INA provides that the government "may permit a[ noncitizen] voluntarily to depart the United States at the [noncitizen]'s own expense . . . in lieu of being subject to [immigration] proceedings . . . . or prior to the completion of such proceedings, if the [noncitizen] is not deportable under section 1227(a)(2)(A)(iii) or section 1227(a)(4)(B) of [title 8]." 8 U.S.C. § 1229c(a)(1). As the Supreme Court has observed, "[v]oluntary departure, under the current structure, allows the [g]overnment and the [noncitizen] to agree upon a quid pro quo," according to which both receive certain benefits, including

that if he did not depart by then, the order would convert to a deportation order.[6]  *See*

Docket Item 7-2 at 1; Docket Item 7 at ¶ 27 (stating that "voluntary departure order

automatically converted to a final order of removal" when Ceesay did not depart); *see*

*also* Docket Item 19 at ¶¶ 5-6 (same).  But Ceesay apparently never left.

Sometime in 2010, Immigration and Customs Enforcement ("ICE") "came to . . .

Ceesay's home in the Bronx . . . and left a phone number [for] him to call."  Docket Item

7 at ¶ 28.  When Ceesay called that number, he was instructed to meet ICE at a police

precinct at a specific time, which he then did.  *Id.*  Upon Ceesay's arrival at the precinct,

ICE detained him without prior notice that it intended to do so, and Ceesay spent the

next three months in a New Jersey jail.  *Id.* at ¶ 29.

At the end of that roughly three-month period, Ceesay was released on an order

of supervision.  *Id.*  More specifically, according to documents provided by the

government with its motion to dismiss, on May 3, 2011, ICE issued Ceesay a "Release

Notification,"[7] which began by informing Ceesay that ICE had "review[ed his] case" and

"concluded that [he] may be released pending [his] removal."  *See* Docket Item 9-2 at 7.

But the notification explicitly advised Ceesay that this release "d[id] not affect [his]

---

the minimization of costs and greater choice in when and how to depart.  *See Dada v.
Mukasey*, 554 U.S. 1, 11-12 (2008) (italics omitted); *see also* Docket Item 9-3 at 4 n.3.

[6] In addition to this action, Ceesay has "filed a motion to reopen with the
immigration court on March 31, 2025."  Docket Item 7 at ¶ 51.  The immigration judge
appears to have denied that motion.  *See* Docket Item 31.

[7] Ceesay did not include the Release Notification with his amended petition,
apparently because he did not have access to it at the time of filing.  *See* Docket Item 7
at ¶ 46; Docket Item 7-2 (documents provided by ICE, which did not include the
Release Notification).  But he has not disputed its accuracy and in fact relies upon it in
some of his arguments.  *See, e.g.*, Docket Item 25 at 15-16.

removal order," which remained in effect. *See id.* According to the notification, Ceesay's "release w[ould] be subject to certain written conditions that w[ould] be provided to [him] shortly, and by which [he] must abide." *Id.* Particularly relevant here, the notification stated: "Once a travel document is obtained, you will be required to surrender to ICE for removal. You will, at that time, be given the opportunity to prepare for an orderly departure." *Id.*

Ceesay also was told that if he violated a condition of release or any law, he could be "taken back into custody" and that he was required to "keep ICE advised of [his] address at all times." *Id.* Under the conditions, Ceesay was to regularly check in with ICE in Manhattan, something that he did for the next approximately fourteen years. Docket Item 7 at ¶ 30; *see id.* at ¶ 4.

On February 19, 2025, Ceesay appeared for one of his "regularly scheduled check-in[s] with ICE." *Id.* at ¶ 4. He was not told that he was going to be detained. *Id.* at ¶¶ 4, 31. At the meeting, an ICE officer became "upset with [Ceesay because] he did not have a passport." *Id.* at ¶ 31. In fact, the officer became "enraged" and shouted that Ceesay was going to be arrested and "taken to jail." *Id.* at ¶ 32. Ceesay then was taken into ICE custody and detained first at the Orange County Jail and then at the Nassau County Jail. *Id.* at ¶¶ 32-34. While at the latter, "a medical professional . . . checked . . . Ceesay and determined that he was not medically cleared to remain at the facility." *Id.* at ¶ 34. So he was taken to BFDF, where he currently is detained. *Id.* at ¶ 36.

Ceesay did not obtain counsel until after he was taken to BFDF, when he met lawyers from Robert F. Kennedy Human Rights—the organization that currently

represents him—"during a pre-scheduled legal presentation" on March 4, 2025. *Id.* at

¶ 37. The lawyers noticed that Ceesay appeared to be in significant "medical distress"

and asked that he be taken to the BFDF medical unit, which then sent him to an

"outside . . . medical provider." *Id.* at ¶ 38. Ceesay had "suffered 'a transient ischemic

attack'" that led him to be hospitalized overnight. *Id.* at ¶¶ 2, 38; Docket Item 7-1 at 1.

He nonetheless was sent back to BFDF, where he remains. Docket Item 7 at ¶ 1, 4.

The government contends—and Ceesay has not disputed—that it executed a

"Notice of Revocation of Release" on February 19, 2025.[8] Docket Item 19 at ¶ 26;

Docket Item 9-2 at 11 (copy of notice attached to motion to dismiss). The notice stated

that the "decision [to revoke Ceesay's release was] made based on a review of [his] file

and/or [his] personal interview, in light of the fact that ICE was"—that is, had been—

"able to obtain a valid travel document to effect [his] repatriation." Docket Item 9-2 at

11. The notice further informed Ceesay:

> [P]ursuant to 8 [C.F.R §] 241.4, you are to remain in ICE custody at this
> time. You will promptly be afforded an informal interview at which you will
> be given an opportunity to respond to the reasons for the revocation. If you
> are not released after the informal interview, you will receive notification of

---

[8] This document was not filed with the amended petition, apparently due to ICE's
failure to provide that and other documents. Before commencing this action, Ceesay's
counsel repeatedly asked ICE for various documents. Docket Item 7 at ¶¶ 39-41, 43.
But by the time Ceesay filed his amended petition, ICE had provided a mere six pages
of documents, which did not include either the Notice of Revocation or the travel
document referenced in that notice. *Id.* at ¶¶ 43, 46. Ceesay also says that ICE failed
to notify his counsel of his meeting with the consulate, despite a specific request that
ICE do so. *Id.* at ¶¶ 39, 41. Ceesay's attorneys eventually were able to join the
meeting and to adjourn it to give them more time to prepare. *Id.* at ¶ 42.

a new review, which will occur within approximately three months of the date of this notice.

*Id.* It was digitally signed by Darius L. Robinson, the Assistant Field Office Director for ICE's New York Field Office, on February 19, 2025, at 7:54 p.m. *Id.*; *see also* Docket Item 19-2 at 11; Docket Item 19-4 at 1.

In its motion to dismiss, the government conceded that the notice revoking Ceesay's release included at least one inaccuracy: the statement that ICE "was able to obtain a valid travel document" for Ceesay. Docket Item 9-3 at 5 & n.4. "It appears," the government said, "that the word 'was' should have been 'is'"; in fact, when the motion to dismiss was filed, ICE still did not have a travel document for Ceesay's removal, although it "anticipate[d] being able to obtain one forthwith." *Id.* at 5 n.4. A few weeks later, on the day that this Court held oral argument on the motion to dismiss, the government informed the Court that ICE had obtained a travel document to effect Ceesay's removal, Docket Item 16, which subsequently was scheduled for the second week of May, Docket Item 20.

As noted above, after the Court denied the government's motion to dismiss, *see* Docket Item 17, it held a hearing on Ceesay's petition, *see* Docket Items 27 and 28. At that hearing, Dr. Shin provided extensive testimony on Ceesay's health conditions and how those conditions impact his life. Docket Item 27 at 12-23.

Ceesay also testified. *See id.* at 23. In addition to describing his medical conditions, he provided an account of February 19, 2025, the day on which he was arrested and re-detained by ICE. *Id.* at 23-28. According to Ceesay, he left his house around five that morning to go to the ICE office, where he waited in line for "[a] long time" before finally going "in to report." *Id.* at 25-26. The ICE officer—whom Ceesay did

8

not identify—"t[ook his] paper and ask[ed] if [he had a] passport." *Id.* at 26. Ceesay,

who testified that he had not been told to bring a passport, said that he had no passport

and tried to explain the specifics of his situation, including the fact that he had come to

the country 35 years ago without a valid passport. *Id.* at 26-27. But the ICE officer

"[s]tarted yelling" at him, asking whether Ceesay "want[ed] to go home in handcuff[s]."

*Id.* at 26. Two ICE officers then said that they were going to "find that travel document,"

apparently referring to the document that would be used to deport Ceesay, and "took

[Ceesay] to [another] floor" to interrogate him about how he had come to the United

States and about his lack of a passport. *See id.* at 27. They accused him of being a

"liar," which he denied, and then "start[ed] asking [him] question[s]." *Id.* Ceesay told

them that he "d[oes]n't answer questions." *Id.* Indeed, he informed them that he is

unable to "read," "write," or "sign" documents. *Id.*

    Ceesay testified that the ICE officers then took him to another floor to be

fingerprinted. *Id.* at 28. Later, after someone—Ceesay does not say who—"check[ed

his] blood pressure," which "was high," ICE officers took him to the hospital, where he

was given "some pills." *Id.* ICE officers then took him to the Orange County Jail, where

he stayed "one night." *Id.* The next morning, he was taken to the Nassau County Jail,

again for one night; a doctor at that jail "checked [him]," and he then was returned to the

custody of ICE officers. *Id.* at 29. After a brief stop at the ICE office where he had first

been detained, Ceesay was taken to BFDF. *Id.*

    Neither side called any of the ICE officers involved in Ceesay's arrest or re-

detention. *See id.* at 31-32. Instead, both sides submitted a joint stipulation stating that

before February 19, 2025, no official "provide[d] advance notice to [Ceesay] . . . that he

would be detained" at his scheduled check-in "other than [that] set forth in the Release

Notification dated May 3, 2011."[9]  Docket Item 26 at ¶ 1.  Both sides also stipulated that

ICE did not "instruct . . . Ceesay . . . to bring a passport [to] his February 19" check-in,

nor did they provide him with "a hearing upon arrest."  *Id.* at ¶¶ 2-3.

Ceesay's amended petition seeks several items of relief:  He asks the Court to

(1) "[e]njoin [his] removal or transfer outside the jurisdiction of this Court and the United

States pending its adjudication of th[e] petition"; (2) "[d]eclare that [his] detention

violates the INA, regulations[,] and the Due Process Clause of the Fifth Amendment

because he [was] released on an" order of supervision; (3) "[d]eclare that [his] detention

. . . violates [s]ection 504 of the Rehabilitation Act"; and (4) "[o]rder [Ceesay's]

immediate release."[10]  Docket Item 7 at 23-24.

## LEGAL PRINCIPLES

### I.    MOTION TO DISMISS

Under Federal Rule of Civil Procedure 12(b), a complaint—or, as here, a pleading

that styles itself both as a complaint and as a petition—may be dismissed for "lack of

subject[ ]matter jurisdiction" or for "failure to state a claim upon which relief can be

granted."  Fed. R. Civ. P. 12(b)(1), (6); *see Williams v. DHS/ICE/Immigr. Ct.*, 2023 WL

3585849, at *1 (W.D.N.Y. May 22, 2023) ("A court reviews a motion to dismiss a habeas

---

[9] As noted above, the parties also had submitted declarations from the ICE officials and Ceesay, as well as a letter from Dr. Shin, before the hearing.  Docket Items 19-1, 19-2, 19-3, 19-4, 19-5, 25-1, and 25-2.  The Court has reviewed and considered those filings in making its decision here.

[10] Ceesay also seeks an award of costs and attorney's fees as well as any "other relief . . . this Court may deem just and proper."  Docket Item 7 at 24.

petition according to the same principles as a motion to dismiss a civil complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6)." (quoting *Hines v. United States*, 2023 WL 2346540, at *2 (D. Conn. Mar. 3, 2023))); *Hajati v. U.S. Dep't of Prob.*, 2023 WL 2895903, at *1 (D. Conn. Mar. 24, 2023) (similar).

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings." *Id.* (citing *Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986)); *see N-N v. Mayorkas*, 540 F. Supp. 3d 240, 251 (E.D.N.Y. 2021) ("[C]ourts evaluating Rule 12(b)(1) motions 'may resolve the disputed jurisdictional fact issues by referring to evidence outside . . . the pleadings, such as affidavits.'" (quoting *Zappia v. Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000))). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova*, 201 F.3d at 113.

A complaint is properly dismissed for failure to state a claim under Rule 12(b)(6) if it does not include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for

more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

## II.    SECTION 2241 PETITION

28 U.S.C. § 2241 "authorizes a district court to grant a writ of habeas corpus whenever a petitioner is 'in custody in violation of the Constitution or laws or treaties of the United States.'" *Wang v. Ashcroft*, 320 F.3d 130, 140 (2d Cir. 2003) (quoting 28 U.S.C. § 2241(c)(3)). "When a petitioner brings a habeas petition [under section] 2241, the petitioner 'bears the burden of proving that he is being held contrary to law; and because the habeas proceeding is civil in nature, the petitioner must satisfy his burden of proof by a preponderance of the evidence.'" *Dzhabrailov v. Decker*, 2020 WL 2731966, at *3 (S.D.N.Y. May 26, 2020) (quoting *Skaftouros v. United States*, 667 F.3d 144, 158 (2d Cir. 2011)). "The equitable principles governing [section] 2241 are reflected in the plenary discretion vested in habeas courts to 'hear and determine the facts, and dispose of the matter as law and justice require.'" *Id.* (alterations omitted) (quoting *Pinkney v. Keane*, 920 F.2d 1090, 1093 (2d Cir. 1990)).

**DISCUSSION**

As noted above, both in its motion to dismiss—which the Court denied from the bench on April 10, 2025—and in its answer to the amended petition, the government says that this Court must dismiss the amended petition for lack of subject matter jurisdiction. *See* Docket Item 9-3 at 7-9, 12-14; Docket Item 19-6 at 14-16. It also argues that the amended petition fails both to state a claim for relief and, necessarily, to establish Ceesay's entitlement to that relief. Docket Item 9-3 at 9-12; Docket Item 19-6

at 16-24.  Mindful of its obligation to ensure that it has jurisdiction in any case, the Court

begins by addressing the jurisdictional questions before turning to whether Ceesay is

entitled to relief.

## I.    SUBJECT MATTER JURISDICTION

In its motion to dismiss, the government argues that 8 U.S.C. § 1252(b)(9) and

(g) deprive this Court of jurisdiction over Ceesay's amended petition.  Docket Item 9-3

at 7-9.  In its memorandum of law in support of its answer, the government reiterates

those arguments,[11] Docket Item 19-6 at 14-15, and contends that another part of

section 1252 also bars the Court from exercising jurisdiction over Ceesay's challenge to

ICE's exercise of discretion, *id.* at 19-20.  Finally, the government argues throughout its

filings that Ceesay's case is nonjusticiable: that is, that even if this Court found that the

manner of Ceesay's detention violated the law, the relief he seeks would not

meaningfully address that alleged injury.

For the reasons that follow, the Court rejects each of the government's

jurisdictional arguments.

### A.    Sections 1252(b)(9) and (g)

Section 1252(b)(9) provides that "[j]udicial review of all questions of law and fact,

including interpretation and application of constitutional and statutory provisions, arising

from any action taken or proceeding brought to remove a[ noncitizen] from the United

---

[11] This second filing focuses on section 1252(g) and does not refer to section
1252(b)(9), although the two arguably operate in tandem.  In any event, because the
government cites both sections in its motion to dismiss, the Court addresses both here.

States under this subchapter shall be available only in judicial review of a final order." 8

U.S.C. § 1252(b)(9).  And section 1252(g) states that

> [e]xcept as provided in this section and notwithstanding any other provision
> of law (statutory or nonstatutory), including section 2241 of Title 28, or any
> other habeas corpus provision, . . . no court shall have jurisdiction to hear
> any cause or claim by or on behalf of any [noncitizen] arising from the
> decision or action by [ICE]  to commence proceedings, adjudicate cases, or
> execute removal orders against any [noncitizen] under this chapter.

8 U.S.C. § 1252(g).

Section 1252 effectively strips district courts of jurisdiction to review a final order

of deportation.  *See De Ping Wang v. Dep't of Homeland Sec.*, 484 F.3d 615, 615-16

(2d Cir. 2007).  Indeed, the Second Circuit has held that section 1252 bars a district

court from reviewing either a direct or an indirect challenge to an order of removal.  *See*

*Delgado v. Quarantillo*, 643 F.3d 52, 55 (2d Cir. 2011) (finding that section 1252

stripped the district court of jurisdiction to hear an action seeking adjudication of an I-

212 application for permission to reapply for admission because it was an indirect

challenge to an order of removal).  Instead, a noncitizen may challenge a final order of

removal only by filing a timely "petition for review" in the "appropriate court of appeals."

*See* 8 U.S.C. § 1252(a)-(b).  And "because district courts have no jurisdiction to review

final orders of removal, they have no jurisdiction to review requests for stays of

removal."  *Al-Garidi v. Holder*, 2009 WL 1439216, at *1 (W.D.N.Y. May 15, 2009).

In its motion to dismiss, the government argues that under section 1252, this

Court can neither stay nor enjoin Ceesay's removal.  Docket Item 9-3 at 6-7.  This Court

agrees that it has no jurisdiction to grant such relief.  But in his response to the

government's motion, Ceesay makes clear that his amended petition seeks no such

relief, arguing that the government mischaracterizes his claims.  Docket Item 12 at 12.

By letter reply, the government counters that it is Ceesay—not the government—who is mischaracterizing the amended petition.  Docket Item 13 at 1-2.

The Court agrees with the government that Ceesay's amended petition is not a model of clarity on this point:  In its prayer for relief, the amended petition asks this Court to "[e]njoin [p]etitioner's removal or transfer . . . pending . . . adjudication of this petition."  Docket Item 7 at 23.  But Ceesay now has clarified that he "does not seek an [o]rder from this Court that stays his removal from the United States" and merely "requests that his transfer outside of the Court's jurisdiction and the United States be enjoined pending the adjudication of th[e amended p]etition."  Docket Item 12 at 12.  So the Court does not construe the amended petition as asking this Court to enjoin Ceesay's removal—relief that, again, the Court has no power to grant.[12]  *See* 8 U.S.C. § 1252(g); *Al-Garidi*, 2009 WL 1439216, at *1.

But the government does not simply argue that section 1252 bars any claims that would lead to enjoining Ceesay's order of removal; rather, it contends that section 1252 strips this Court of jurisdiction to entertain any of Ceesay's claims.  Docket Item 9-3 at 7-9.  Indeed, it says, "[t]his case arises out of the execution of [Ceesay's] removal order, and therefore this Court lacks jurisdiction to hear this case."  *Id.* at 7.  According to the government, Ceesay has admitted that the purpose of "his 'ongoing detention . . . is to remove him from the United States.'"  *Id.* at 9 (quoting Docket Item 7 at ¶ 13).  Thus, the government says, this case stems from ICE's attempt to effect Ceesay's removal, and section 1252(g) therefore bars the Court from entertaining it.

---

[12] The Court addresses Ceesay's request to enjoin his transfer below.  *See infra* note 18.

This argument proves far too much.  After all, detention under or in connection with a final order of removal always is related to the execution of an immigration order, but courts routinely hear habeas petitions filed by individuals subject to a final order of removal.  Indeed, in *Zadvydas*, the Supreme Court explicitly held that "[section] 2241 habeas corpus proceedings remain available as a forum for statutory and constitutional challenges to post-removal-period detention."  533 U.S. at 688.

More recently, in *Jennings v. Rodriguez*, the Supreme Court rejected a reading of section 1252(b)(9) that would have limited detained noncitizens to challenging their detentions only through petitions for review of the underlying removal orders in the court of appeals.  583 U.S. 281, 292-95 (2018) (plurality opinion).  As Justice Alito explained, writing for a plurality of the Court, while "it [could] be argued that" such a challenge arose from the government's decision to remove the noncitizen "in the sense that if those actions had never been taken, the [noncitizens] would not be in custody at all," such an "expansive interpretation of [section] 1252(b)(9) would lead to staggering results."  *Id.* at 293.  Indeed, "[i]nterpreting 'arising from' in this extreme way would also make claims of prolonged detention effectively unreviewable."  *Id.*

Moreover, and as the Second Circuit has held, "a suit brought against immigration authorities is not per se a challenge to a removal order; whether the district court has jurisdiction . . . turn[s] on the substance of the relief that a [litigant] is seeking."  *Delgado*, 643 F.3d at 55 (italics omitted).  Accordingly, district courts in this circuit have distinguished between challenges to ICE's discretion to execute a removal order, which are barred, and challenges to the manner in which ICE executes the removal order, which are not. *See Torres-Jurado*, 2023 WL 7130898, at *2 (collecting cases); *Ahmed v.*

16

*Freden*, 744 F. Supp. 3d 259, 264 (W.D.N.Y. 2024) (noting that while "[d]istrict courts do not have jurisdiction over challenges to the legality of final orders of deportation, exclusion, and removal," they retain "jurisdiction to hear immigration-related detention cases").

In *Torres-Jurado*, for instance, the court held that the petitioner's claims that ICE violated the Fifth Amendment's guarantee of due process by "revok[ing an] ICE Stay [of petitioner's removal] without providing notice or an opportunity to be heard" were not barred by section 1252(g).[13]  2023 WL 7130898, at *3.  As the court explained, the petition did not challenge "the wisdom of ICE's decision to remove him"—which would be barred by section 1252(g)—"but [rather] challenge[d] ICE's legal authority to revoke the ICE Stay without process."  *Id.* (internal quotation marks omitted).  And that latter challenge was not barred by section 1252(g).  *See id.*; *Michalski v. Decker*, 279 F. Supp. 3d 487, 495 (S.D.N.Y. 2018) (finding that because immigration detainee's "petition only challenge[d] the extent of the Attorney General's authority to detain him as opposed to the Attorney General's exercise of discretion [to commence immigration proceedings, adjudicate cases, or execute removal orders], [section] 1252(g) [wa]s inapplicable"); *see also Gordon v. Herron*, 2009 WL 909640, at *3 (W.D.N.Y. Mar. 31, 2009) (noting that district court could "consider only issues surrounding [petitioner's] continued detention and should not address his derivative citizenship contentions" (emphasis omitted)).

---

[13] The petitioner's order of supervision included an "ICE Stay" according to which "stay of [his] removal [was] granted indefinately [sic] in [his] case."  *Torres-Jurado*, 2023 WL 7130898, at *1 (citation omitted).

The cases cited by the government, *see* Docket Item 9-3 at 8-9, do not change the above analysis.  As an initial matter, the Second Circuit's decision in *Singh v. Napolitano*, 500 F. App'x 50 (2d Cir. 2012) (summary order),[14] and the Third Circuit's decision in *Tazu v. Att'y Gen. United States*, 975 F.3d 292 (3d Cir. 2020), are factually distinguishable.

In *Singh*, the petitioner claimed that his detention was unlawful because the United States Citizenship and Immigration Services ("USCIS") had illegally terminated his grant of asylum, resulting in the final order of removal under which he was detained.  500 F. App'x at 52.  Because "the true error of law identified in [the] petition [wa]s [USCIS]'s legal conclusion that [the petitioner wa]s subject to a final order of removal," the court held, "[the] petition indirectly challenge[d] the validity of [a] final order of removal and the [government]'s ability to execute that order."  *Id.*  And so the district court had no jurisdiction over the petitioner's habeas claim.  *Id.* at 54.

In contrast, Ceesay does not ask this Court to rule—even indirectly—on the lawfulness of his removal order.  In fact, the parties agree that Ceesay is subject to a valid final order of removal.  *See* Docket Item 25 at 5 (petitioner's statement that "[i]t is undisputed that . . . Ceesay has a final order of removal[] dated November 22, 1997").  Instead, Ceesay argues that his detention is unlawful because the government improperly revoked the order of supervision under which he had been released for more than a decade.  *See generally* Docket Item 7.  So unlike the petitioner in *Singh*, Ceesay

---

[14] The Court notes that *Singh*, a summary order of a panel of the Second Circuit, does not constitute binding precedent; nonetheless, its core holding—that district courts cannot exercise jurisdiction over even indirect challenges to final orders of removal—merely reiterates prior holdings by the circuit.  *See Delgado*, 643 F.3d at 55.

does not challenge ICE's ability to remove him but only the legality of his current detention, and section 1252 therefore does not bar this Court from exercising jurisdiction. *See Torres-Jurado*, 2023 WL 7130898, at *2; *Michalski*, 279 F. Supp. 3d at 495.

*Tazu* also is distinguishable. There, the Third Circuit explicitly "h[e]ld [only] that a *brief* door-to-plane detention is integral to the act of 'execut[ing] [a] removal order[ ]'" and thus that under section 1252(g), such an abbreviated period of detention could not be challenged by way of a habeas action. *Tazu*, 975 F.3d at 298 (emphasis added) (alterations in original) (quoting 8 U.S.C. § 1252(g)). Here, Ceesay does not challenge ICE's ability to detain him in order to deport him. Rather, he challenges ICE's ability to hold him in detention without adequate process for weeks and months on end. *Compare* Docket Item 7, *with Tazu*, 975 F.3d at 298-99. And the fact that the government now says that Ceesay's removal is imminent, estimating that it will take place sometime during the second week of May, *see* Docket Item 20, does not retroactively deprive this Court of jurisdiction.[15]

---

[15] The government also cites the Eastern District of Louisiana's decision in *Westley v. Harper*, 2025 WL 592788, at *6 (E.D. La. Feb. 24, 2025). That case involved a challenge similar to the one that Ceesay raises here. As in this case, the petitioner in *Westley* argued that ICE had violated the Constitution and federal law by revoking her order of supervision without adequate process. *Id.* The court held that it could not exercise jurisdiction over those claims under section 1252(g), distinguishing *Zadvydas* and *Jennings* on the grounds that those cases had involved a period of "prolonged detention" whereas in the petitioner's case, "ICE intended to detain and deport [her] as soon as possible," even if "[a]dmittedly, the period of [the petitioner's detention ended up being] extended" somewhat. *Id.*

*Westley*—the opinion of another district court in a different circuit—is not binding on this Court. *See United States v. Morales*, 881 F. Supp. 769, 771 (D. Conn. 1995) ("While a decision of another district judge may be treated as persuasive, it is not binding authority on this court."). And this Court is not persuaded by its reasoning,

For all those reasons, sections 1252(b)(9) and (g) do not preclude this Court from exercising jurisdiction over Ceesay's petition.

### B.    Section 1252(a)(2)(B)(ii)

In its memorandum of law in support of its answer, the government argues that yet another provision of section 1252 bars at least some of the relief that Ceesay seeks. Docket Item 19-6 at 20.  More specifically, it argues that Ceesay's "APA challenge to ICE's . . . decision to revoke his supervised release fails . . . because the Court is deprived of subject[ ]matter jurisdiction by virtue of 8 U.S.C. § 1252(a)(2)(B)(ii)."  *Id.* Under that section, federal courts have no "jurisdiction to review . . . any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security."[16]  8 U.S.C. § 1252(a)(2)(B)(ii).

The government is correct that the regulations at issue here allow specified ICE officials to revoke supervised release "in the exercise of discretion," *see* 8 C.F.R. § 241.4, and that the statute bars courts from second-guessing the exercise of that discretion, *see* 8 U.S.C. § 1252(a)(2)(B)(ii).  But that does not mean that section 1252(a)(2)(B)(ii) bars any challenge to the way in which ICE revokes release.  As the

---

particularly because the Supreme Court precedent in *Zadvydas* and *Jennings* points it in a different direction.  Indeed, while *Westley* attempts to distinguish those cases, the Court finds the distinction on which the *Westley* court relied somewhat troubling:  Surely a court's jurisdiction over challenges to detention cannot turn on whether or not ICE officials intend—or say they intend—a noncitizen's detention to be brief.

[16] Section 1252(a)(2)(B)(ii) provides an exception for "the granting of relief under section 1158(a)," which governs the authority to apply for asylum.  8 U.S.C. § 1252(a)(2)(B)(ii); *see id.* § 1158(a).  But Ceesay has not challenged any asylum-related decisions, and so the Court need not address that exception.

Second Circuit has held, even when a "statute strips jurisdiction over a substantive discretionary decision, [it] does not strip jurisdiction over procedural challenges." *Mantena v. Johnson*, 809 F.3d 721, 728 (2d Cir. 2015).  In other words, while courts cannot question the discretion that is exercised, they can address the process used to exercise that discretion.

In *Mantena*, for example, the plaintiff challenged "USCIS's revocation of [a previously] approved [visa] petition" as well as its "subsequent denial of her [visa] application."  *Id.* at 727.  More specifically, she argued that USCIS had failed to provide her with notice of its adverse decisions, "violat[ing] the agency's own regulations [as well as her] constitutional due process rights."  *Id.*  After the district court dismissed her claims for lack of subject matter jurisdiction under section 1252(a)(2)(B)(ii) because USCIS's decisions were discretionary, the Second Circuit reversed.  *Id.* at 728.

In his opinion for the court, Judge Guido Calabresi noted that while the Second Circuit previously had suggested that the decision on visa petitions was indeed committed to USCIS's discretion, "the actual issue [presented by Mantena's complaint was] a different one."  *Id.*  "Regardless of whether the substantive revocation decision is shielded from judicial review," Judge Calabresi explained," no party has provided authority to suggest that the *procedure* surrounding the substantive decision is similarly shielded."  *Id.*  And the court "h[e]ld that it [wa]s not, particularly where the procedural requirements are codified in statute or in regulations."  *Id.* at 728-29.  In other words, an official "may well not have complete discretion over the *procedure* for making a decision, even if the *substantive* decision falls within [the official's] discretion."  *Id.* at 729.  And in cases where procedural requirements bind an official's discretion, "courts

retain jurisdiction to review whether those requirements have been met." *Id.* (quoting *Firstland Int'l, Inc. v. I.N.S.*, 377 F.3d 127, 130 (2d Cir. 2004)).

Indeed, the *Mantena* court held that even if it were ultimately determined that procedural requirements did not bind USCIS in this instance, the district court still would have erred in dismissing the plaintiff's procedural claims for lack of subject matter jurisdiction. Instead, "[t]he proper course, under such circumstances, would be to find subject matter jurisdiction and then . . . [, if appropriate, to] find that the plaintiff had no right to the asserted procedural safeguards, and, therefore, had provided no claim upon which relief could be granted." *Id.* at 729-30.

Here, Ceesay does not challenge ICE's substantive decision to revoke his order of supervised release; instead, he challenges the manner in which ICE effected that revocation, asserting that it was done without adequate process and in violation of ICE's own regulations. *See* Docket Item 7 at ¶¶ 61-66; Docket Item 25 at 13-16. Section 1252(a)(2)(B)(ii) therefore does not bar this Court from exercising jurisdiction over Ceesay's claims.[17]

In sum, while section 1252 would bar this Court from exercising jurisdiction over any claims to enjoin or stay Ceesay's removal, Ceesay is not seeking such relief here. And while another part of that same section precludes this Court's second-guessing the substance of discretionary decisions made by ICE, Ceesay does not ask this Court to

---

[17] As noted above, the government seems to argue that section 1252(a)(2)(B)(ii) bars the Court from exercising jurisdiction only over Ceesay's APA claims. Docket Item 19-6 at 19-22.

do that either.  So for the reasons explained above, section 1252 does not deprive this
Court of jurisdiction over Ceesay's challenge to his detention by ICE.[18]

### C.    Justiciability

Finally, the government argues that this action is nonjusticiable.  Docket Item 9-3
at 12-14; Docket Item 19-6 at 15-16.  More specifically, it says that because Ceesay
challenges only the process under which he was detained—not ICE's authority to detain
him—nothing would stop ICE from immediately detaining him again if this Court ordered
his release.  Docket Item 9-3 at 12-14; Docket Item 19-6 at 15-16 (arguing that "even if
[the Court ordered Ceesay's] release[] from custody right now, ICE could merely re-
detain him, follow whatever process this Court deems warranted, and remove him

---

[18] Ceesay also asked this Court to enjoin ICE from transferring him from this
district or, in the alternative, for "the government [to] be ordered to provide at least . . .
72[] hours' notice prior to any transfer to [his] counsel."  Docket Item 12 at 11; *see*
Docket Item 7 at 23 (asking the Court to enjoin Ceesay's transfer).  The government
argues that the request to enjoin Ceesay's transfer should be denied, noting that this
Court frequently has held that because "jurisdiction attaches on the initial filing for
habeas corpus relief," enjoining transfer is not required to protect the Court's
jurisdiction.  Docket Item 9-3 at 6-7; *see, e.g.*, *Walker v. Searls*, 2024 WL 1735213
(W.D.N.Y. Apr. 23, 2024) (this Court's holding that "regardless of where [the petitioner]
is housed, this Court retains jurisdiction over his habeas petition" so enjoining transfer
was unnecessary).  Therefore, the government says, there is no need "to interfere with
DHS's authority . . . to arrange for appropriate places of detention."  While that certainly
is true, *see Santillanes v. U.S. Parole Comm'n*, 754 F.2d 887, 888 (10th Cir. 1985)
(stating that a court's jurisdiction over a habeas petition "is not destroyed by a transfer
of the petitioner and the accompanying custodial change"), courts have on occasion
enjoined transfer in light of detainees' health concerns, such as during the height of the
COVID-19 pandemic, *see, e.g.*, *Garcia v. Wolf*, 2020 WL 4668189, at *1 (E.D. Va. Aug.
11, 2020).  And Ceesay raises health concerns here.  Docket Item 7 at ¶¶ 2, 6; *see*
Docket Item 12 at 11.

Nevertheless, this Court need not and does not reach that issue.  Because the
Court orders Ceesay's release, *see infra* Section II, it denies his motion to enjoin
transfer as moot.

immediately"; if that were to happen, "his alleged prior harm of being improperly taken into custody would not be remedied at all").

The government's argument misses the point.  Ceesay challenges the process under which he was detained, regardless of ICE's substantive authority to do so; that is, he challenges not only the fact that he is currently held but the fact that he is being held *without the proper procedures.  See* Docket Item 7; *see also Torres-Jurado*, 2023 WL 7130898, at *2 (noting that notwithstanding ICE's discretion to execute a removal order, ICE "cannot remove" a noncitizen—even one subject to a final removal order—"in any manner [it] please[s]").  And because Ceesay's release would indeed ameliorate any harm that results from his detention without due process, release is an effective remedy even if the government immediately re-detains him in a way that follows the rules.

The only cases cited by the government in support of its justiciability argument—*O'Shea v. Littleton*, 414 U.S. 488 (1974), and *Yearwood v. Barr*, 391 F. Supp. 3d 255 (S.D.N.Y. 2019)—are inapposite.  *See* Docket Item 9-3 at 12-14.  In *O'Shea*, the plaintiffs brought civil rights claims against county officials, including a magistrate and associate judge, based on a pattern of allegedly "discriminatory enforcement and administration of criminal justice" in a particular Illinois county.  414 U.S. at 491.  The Supreme Court dismissed the claims against the judges for lack of standing because none of the plaintiffs were currently "serving an allegedly illegal sentence or were on trial or awaiting trial," even if they had been previously.  *Id.* at 493, 496.  Thus, the Court held, they had no standing to seek injunctive relief against the judges because "[p]ast exposure to illegal conduct does not in itself show a present case or controversy

regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Id.* at 495-96.

The government relies on this language to argue that because Ceesay challenges only past actions, his claims "sound in tort, not habeas or administrative law." Docket Item 19-6 at 6, 15-16. But this argument ignores the fact that unlike the *O'Shea* plaintiffs, Ceesay claims that he is suffering a "continuing, present adverse effect[]": namely, his ongoing detention without the process he says is due to him. *See* Docket Item 7.

*Yearwood* likewise does not support the government's position. There, the noncitizen petitioner already had been deported, and he did not contest the fact that the government would have deported him regardless of the procedures provided. 391 F. Supp. 3d at 260-62. The court thus found that the petitioner could not bring a habeas petition seeking his return to the United States because he already had been released—albeit in another country. *Id.* (stating that "[i]t [wa]s possible that the petitioner's claims could be redressed by damages[, but] the petitioner ha[d] not sought such relief, and [his] complaints about the procedural defects in removing him would not be redressed by bringing him back to the United States subject to being removed again"). This case is different. Ceesay has not been deported, and he challenges his ongoing detention, not the government's ability to deport him. So while habeas relief—release—would not have addressed Yearwood's complaints, the same is not true here.

Furthermore, the government's suggestion—that a complaint about failing to follow proper process is nonjusticiable so long as the government says that the result would have been the same had it followed the required procedure—is downright

frightening.  Procedure is not mere puffery, a gesture that is irrelevant so long as the result is correct.  The Constitution safeguards not just substantive rights under the law but *due process* as well.  U.S. Const. amends. V, XIV.  That process is at the core of what our Constitution guarantees.

Indeed, courts have repeatedly recognized the importance of process, particularly where, as here, a person's freedom stands in the balance.  *See Accardi*, 347 U.S at 268 (holding that if petitioner showed regulations had been violated, he was entitled to a new hearing because while he "may still fail to convince the Board or the Attorney General, in the exercise of their discretion, that he is entitled to suspension [of a removal order,] at least he will have been afforded that due process required by the regulations in such proceedings"); *United States v. Tateo*, 214 F. Supp. 560, 567 (S.D.N.Y. 1963) ("No matter how heinous th[e] offense charged, how overwhelming the proof of guilt may appear, or how hopeless the defense, a defendant's right to continue with his trial may not be violated."); *see also United States v. Haymond*, 588 U.S. 634, 637 (2019) ("Only a jury, acting on proof beyond a reasonable doubt, may take a person's liberty.  That promise stands as one of the Constitution's most vital protections against arbitrary government.").  In the United States, even a scoundrel has the right to remain free until due process has proven him a scoundrel.

The Supreme Court's seminal decision in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), makes that very point.  The Court began by finding that the federal government indeed had "the authority to detain citizens who qualify as 'enemy combatants.'"  *Id.* at 516-24.  It nonetheless held that even when detention was "legally authorized, there remain[ed] the question of what process is constitutionally due to a citizen who disputes

his enemy-combatant status," ultimately holding that some process was due.  *Id.* at 524, 533.  In other words, the mere fact that the government has the authority to detain someone does not mean that it may do so in any manner it chooses, without affording due process.  *See, e.g.*, *Torres-Jurado*, 2023 WL 7130898, at *2.

Of course, unlike Yaser Hamdi, a citizen who challenged whether he had been properly classified as an enemy combatant, Ceesay is indisputably a noncitizen.  *See* Docket Item 7.  And there is an appetite in this country—perhaps not felt in all quarters—to treat those born abroad as "others" who are less deserving of even the most basic rights.  But "[noncitizens], even [noncitizens] whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth . . . Amendment[ ]."  *Plyer v. Doe*, 457 U.S. 202, 210 (1982); *see also Shaughnessey v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1954) ("It is true that [noncitizens] who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law.").  This Court has no power to break from those precedents—nor does it wish to, if for no reason other than a selfish one:  The due process rights of any one of us are no more secure than the due process rights of the purportedly "least" of us.[19]

Moreover, at least in this circuit, "when a regulation is promulgated to protect a fundamental right derived from the Constitution or a federal statute, and [the

---

[19] As the Court asked at oral argument, if the government contends that it has the ability to take someone it thinks is a noncitizen off the street without any process whatsoever—without any guarantee even that the person is who the government claims he is—then what is to stop the government from detaining someone who really is a citizen, even perhaps a sitting judge?

government] fails to adhere to it, the challenged deportation proceeding is invalid and a remand to the agency is required"—even in the absence of a showing of prejudice. *See Waldron v. I.N.S.*, 17 F.3d 511, 518 (2d Cir. 1993). And that may be so "even when the regulation requires more than would the specific provision of the Constitution or statute that is the source of the right." *Id.* So to the extent that the Court agrees with Ceesay that his constitutional rights have been violated, it is not enough for the government to say that even if he was detained improperly, he will be re-detained anyway. It is not enough for the government to rhetorically ask: why bother?

In sum, requiring an arm of the government to redo a procedurally deficient decision as the Constitution and the law require is not a meaningless exercise. It cannot be meaningless if this country is to be governed by the rule of law. Accordingly, this case is indeed justiciable, and the Court proceeds to address whether Ceesay is owed the relief he requests.

## II.   LAWFULNESS OF CEESAY'S DETENTION

Ceesay says that ICE officials detained him in violation of his due process rights and ICE's own regulations.[20] *See* Docket Item 7 at ¶¶ 70-77. More specifically,

---

[20] Ceesay also argues that his detention violates the APA and Rehabilitation Act, Docket Item 7 at ¶¶ 78-91, and the government moves to dismiss those claims, *see* Docket Item 9-3 at 9-12. But for the reasons stated below, Ceesay is entitled to the relief he seeks because his detention violates ICE's regulations and due process. So this Court need not, and therefore does not, address whether Ceesay's claims under the Rehabilitation Act would lead to the same result. *See Santiago Franco v. Searls*, 2021 WL 9463174, at *2 (W.D.N.Y. Mar. 3, 2021) ("find[ing] it unnecessary to address the petition's alternative claims for relief" when one claim "alleg[ing] a due process violation" had merit and "the relief [the petitioner] s[ought]" for all the claims in his petition "[was] the same").

Ceesay says that the government violated his rights in three ways.  First, Ceesay says that ICE violated his rights because the official who revoked his release did not have the authority to do so under ICE regulations.  *See id.* at ¶¶ 33-36, 61, 63.  Second, Ceesay says that ICE failed to provide him with "an initial informal interview" so that he could "respond to the reasons for revocation stated in the notification."  *Id.* at ¶¶ 61, 63; *see* 8 C.F.R. § 241.5(l)(1).  Third, Ceesay says that ICE violated his rights by failing to provide the promised "opportunity for an orderly departure."  Docket Item 7 at ¶ 14.  The government responds that Ceesay has failed to show that any of his rights were violated by his re-detention.  *See* Docket Items 9-3, 19-6, and 29.

Both sides have stipulated to the key facts underlying Ceesay's re-detention.[21] For example, both sides now agree that the government did not provide Ceesay with either "advanced notice of arrest" or a "hearing upon arrest."  Docket Item 26 at ¶¶ 3-4. Similarly, both sides do not seem to dispute that Robinson, the Assistant Field Office

---

[21] The Court notes that in earlier stages of this case, the parties disputed several of the facts underlying Ceesay's re-detention.  For example, Ceesay contended that he had been afforded essentially no process in connection with his re-detention—that ICE re-detained him without making the required findings, without giving him any opportunity to be heard, and without affording him the opportunity for an orderly departure.  *See generally* Docket Item 7.  The government, in contrast, contended at oral argument on April 10, 2025, and in its answer that it had given Ceesay an opportunity to be heard in the form of an informal interview, although it maintained—and still apparently maintains—that he was not entitled to such an interview under the regulations.  *See* Docket Item 17; Docket Item 9-3 at 9-11; Docket Item 19-6 at 18-19; Docket Item 19 at ¶¶ 22, 38.  The government further asserted that the ICE official who signed the order revoking Ceesay's release—Robinson—had the authority to do so and did so appropriately.  Docket Item 13 at 2; *see* Docket Item 9-2 at 11.  The government did not contest that it had not given Ceesay the opportunity for an orderly departure prior to his re-detention, although it argued that no such opportunity was required.  Docket Item 19-6 at 21-22.  This Court's denial on the record of the motion to dismiss was premised in part on the parties' dispute regarding the underlying facts, and it ordered a hearing for that reason.

Director for ICE's New York Field Office, signed the order revoking Ceesay's release.
*See* Docket Item 9-2 at 11; Docket Item 19-6 at 9; Docket Item 25 at 13.

The core of the parties' dispute is whether Ceesay was legally entitled to any of
the process at issue and thus whether his current detention without that process
violates the law.  With that in mind, the Court addresses each of the three procedural
deprivations that Ceesay raises.

### A.    Authority to Revoke Release

Ceesay alleges that Robinson, the official who signed his release revocation,
lacked the authority to do so.  Before addressing that claim, the Court provides some
context by looking briefly at the statutory and regulatory framework governing the
revocation of release.

Both sides agree that after Ceesay had been detained for about three months
without the government's obtaining the required documents to facilitate his deportation,
he was released on an order of supervision under 8 C.F.R. § 241.4.  Docket Item 19-6
at 8; Docket Item 25 at 5.  Likewise, both sides agree that Ceesay's release was
revoked under that same section.[22]  Docket Item 19-6 at 20; Docket Item 25 at 5.
Therefore, section 241.4—specifically section 241.4(l)— governs the revocation of
Ceesay's release.

Subsection 241.4(l)(2), entitled "Determination by the Service," provides that

[t]he Executive Associate Commissioner shall have authority, in the
exercise of discretion, to revoke release and return to Service custody a[
noncitizen] previously approved for release under the procedures in this
section. A district director may also revoke release of an alien when, in the

---

[22] Noncitizens subject to a final order of removal also may be released under 8
C.F.R. § 241.13.

district director's opinion, revocation is in the public interest and circumstances do not reasonably permit referral of the case to the Executive Associate Commissioner.

8 C.F.R. § 241.4(l)(2).  That same subsection also says that

[r]elease may be revoked in the exercise of discretion when, in the opinion of the revoking official:

(i) The purposes of release have been served;
(ii) The [noncitizen] violates any condition of release;
(iii) It is appropriate to enforce a removal order or to commence removal proceedings against a[ noncitizen]; or
(iv) The conduct of the [noncitizen], or any other circumstance, indicates that release would no longer be appropriate.

*Id.*

On its face, the regulation seems straightforward enough:  According to its terms, only the "Executive Associate Commissioner" or the "district director"—if the latter finds that "revocation is in the public interest and circumstances do not reasonably permit referral of the case to the Executive Association Commissioner"—may revoke a noncitizen's release.  *See id.*  But the analysis is complicated by the fact that the immigration landscape changed after the September 11 terrorist attacks, and section 241.4 "refers to previous Immigration and Naturalization Service [('INS')] position titles." *See Rombot*, 296 F. Supp. 3d at 387.

For decades, immigration proceedings were within the purview of INS.  *See Zhang v. Holder*, 617 F.3d 650, 655 n.3 (2d Cir. 2010).  But in 2002, Congress passed the Homeland Security Act, "transferr[ing] authority to commence removal proceedings from [INS] to . . . DHS," which, of course, now includes ICE.  *See Ali v. Mukasey*, 524 F.3d 145, 150 (2d Cir. 2008); *Lopez v. Sessions*, 2018 WL 2932726, at *9 (S.D.N.Y. June 12, 2018).  And when the Homeland Security Act transfers functions to DHS,

31

"statutory references to the authority that was formerly responsible for those functions will be deemed to refer to DHS."  *Ali*, 524 F.3d at 150 (citing 6 U.S.C. § 557).

ICE regulations include a similar provision.  *See* 8 C.F.R. § 1.2.  As relevant here, under section 1.2,

> Commissioner means the Commissioner of the Immigration and Naturalization Service prior to March 1, 2003.  Unless otherwise specified, references after that date mean the Director of U.S. Citizenship and Immigration Services, the Commissioner of U.S. Customs and Border Protection, and the Director of U.S. Immigration and Customs Enforcement, as appropriate in the context in which the term appears.

*Id.*

As noted above, section 241.4(l) gives the authority to revoke release to the Executive Associate Commissioner.  Under section 1.2, then, that means conferring the authority on the Executive Associate Director of ICE.  *See* 8 C.F.R. § 1.2; *see also* Docket Item 29 at 6 ("Regulations also make clear that the title 'commissioner' in the former [INS] amounts to the title 'director' in ICE.  Thus, the Executive Associate Commissioner [of] INS is equivalent to the Executive Associate Director [of] ICE." (internal citation omitted)).

The regulation also provides that

> [o]n or after March 1, 2003, pursuant to delegation from the Secretary of Homeland Security or any successive re-delegation, the terms mean, to the extent that authority has been delegated to such official: asylum office director; director, field operations; district director for interior enforcement; district director for services; field office director; service center director; or special agent in charge.  The terms also mean such other official . . . who is delegated the function or authority above for a particular geographic district, region, or area.

8 C.F.R. § 1.2. So under 241.4(l)(2), the officials with the power to revoke release after making certain findings include field office directors and any other official "delegated the

function or authority . . . for a particular geographic district, region, or area."  *See* 8 C.F.R. §§ 1.2, 241.4(l)(2).

Both sides agree that Robinson is the Assistant Field Office Director of ICE's New York Field Office—not the Executive Associate Director of ICE.  *See* Docket Item 25 at 12-13 & n.4; Docket Item 29 at 6.  The government nonetheless contends that Robinson had the authority to revoke Ceesay's release because "[b]y order dated July 25, 2019, Executive Associate Director Nathalie R. Asher delegated her authority under 8 C.F.R. § 241 to [the a]ssistant [f]ield [o]ffice [d]irectors."  Docket Item 29 at 6.  And it has provided a copy of that delegation order.  Docket Item 14.

Ceesay says that for two reasons, the delegation order provided by the government does not give Robinson the authority to revoke Ceesay's release.  First, Ceesay notes that "[i]t is unclear whether [the delegation order] is a public document." Docket Item 15 at 1.  In fact, the Court has been unable to find a public version of the order, nor has the government suggested that the delegation order is a public document.  *See* Docket Item 29 at 6-7.

What is more, and more important, Ceesay notes that the delegation order does not delegate the authority to revoke orders of release.  Docket Item 15 at 1; Docket Item 25 at 13 n.4.  And he is correct:  As relevant here, the order specifically delegates to assistant field officer directors the "[a]uthority under . . . 8 C.F.R. Part 241[] relating to warrants of removal, reinstatement of removal, self-removal, and release of [noncitizens] from detention."  Docket Item 14 at 2.  That does not include the authority to detain noncitizens or to revoke orders releasing them.

33

The government says that Ceesay's argument ignores the fact "that when only a specific authority is delegated, that specific authority is listed by subpart" and that the order clearly delegates all of the Executive Associate Director's powers under "part 241." Docket Item 29 at 6. While the Court agrees with the government that the order clearly refers to part 241, that does not change the fact that it explicitly delegates only specific powers under that part—namely, powers "relating to warrants of removal, reinstatement of removal, self-removal, and release of [noncitizens] from detention." *See* Docket Item 14 at 2.

The government also argues that "[b]ecause [assistant field office directors] had the authority to arrest, apprehend, and detain [noncitizens] at the outset, and the power to release them (which implicitly would include the authority to revoke release, an authority which is contained within the very same subpart as the authority to release, § 241.4), [Ceesay]'s argument that [Assistant Field Office Directors] lack the power to revoke release strains credulity." Docket Item 29 at 7. And it may indeed make sense for an official who has the power to release also to have the power to revoke that release. But that is not the question.

On its face, the delegation order submitted by the government refers only to a limited set of powers under part 241 that do not include the power to revoke release. And the language of section 241.4 specifically limits the power of anyone who is not the Executive Associate Director to revoke release. For example, it provides that "[a] district director may also revoke release of a[ noncitizen] when"—and only when—"in the district director's opinion, revocation is in the public interest and circumstances do not reasonably permit referral of the case to the Executive Associate [Director]." 8

34

C.F.R. § 241.4(l)(2).  So before a district director can revoke release, the district director must make certain findings.  And even if the term "district director" might include Robinson's current role as an "assistant field office director, which is far from clear, the government has not alleged that Robinson made the requisite findings—explicitly or otherwise—before revoking Ceesay's release.  *See* Docket Item 19-4 (Robinson's declaration); Docket Item 19-6 at 9, 18-19; Docket Item 29 at 6-7.

In sum, there is no delegation order clearly giving Robinson the authority to revoke release, and even if there were, there is no caselaw supporting the validity of such a delegation order.  The government has not argued that Robinson had that authority because an assistant field office director is the equivalent of a district director, *see* Docket Item 29 at 6-7, and even if it had, there is no evidence that Robinson made the findings that a district director is required to make before revoking Ceesay's release. As a result, this Court cannot conclude that Robinson had the authority to revoke release, finds that Ceesay's release was not lawfully revoked, and holds that he is entitled to release on that basis alone.  *See Rombot*, 296 F. Supp. 3d at 386-89.

### B. Informal Interview

Ceesay also argues that the government violated its own regulations and his due process rights by failing to provide him with the interview required under section 241.4(l)(1).  Docket Item 7 at ¶¶ 8-9, 63; Docket Item 25 at 10-12.  Again, this Court agrees.

The first subsection of section 241.4(l), entitled "Violation of conditions of release," provides that

> [a]ny [noncitizen] . . . who has been released under an order of supervision or other conditions of release who violates the conditions of release may be

returned to custody. . . . Upon revocation, the [noncitizen] will be notified of the reasons for revocation of his or her release or parole. *The [noncitizen] will be afforded an initial informal interview promptly after his or her return to Service custody to afford the [noncitizen] an opportunity to respond to the reasons for revocation stated in the notification.*

8 C.F.R. § 241.4(l)(1) (emphasis added).  The third and final subsection of the regulation provides that "[i]f the [noncitizen] is not released from custody following the informal interview provided for in paragraph (l)(1) of this section, [the Headquarters Post-order Detention Unit] Director shall schedule the review process"; "[t]he normal review process will commence with notification to the [noncitizen] of a records review and scheduling of an interview, which will ordinarily be expected to occur within approximately three months after release is revoked." *Id.* § 241.4(l)(3).

Again, the government appears to concede that Ceesay was not afforded an informal interview or the opportunity "to respond to the reasons for revocation stated in the notification."  Docket Item 26 at ¶¶ 3-4 (stipulating that "[r]espondents did not provide" Ceesay with "a hearing upon arrest" and stating that in light of the failure to provide notice to Ceesay's counsel, the government would not rely on the interview allegedly provided Ceesay on April 2, 2025, after the commencement of this case).[23]

---

[23] Even if the government did not intend to concede this point, the Court would find, based on the evidence presented, that Ceesay was not provided with the interview referenced in section 241.4(l)(1).  According to the declaration submitted by ICE Officer Damian Giraldo, Giraldo "conducted an informal interview with Ceesay at approximately 2:15 p.m. at 26 Federal Plaza" on the ninth floor, "advised [Ceesay] of the reason his release was revoked[,] and inquired if there was any reason his release should not be revoked."  Docket Item 19-3 at ¶ 4.  Ceesay's account of what occurred then suggests that he certainly did not understand the encounter as an informal interview at which he could contest the reasons that his release was being revoked.  *See* Docket Item 27 at 27.  In any event, even if this was an informal interview, it occurred about five hours before Robinson signed the order revoking Ceesay's release.  *See* Docket Item 9-2 at 11 (showing that order was signed at 7:54 p.m.).  So Ceesay could not have been afforded the opportunity to respond to the reasons his release was revoked before it was revoked.  And all that is even more troubling given that the revocation notification

The government nonetheless argues that the regulations do not entitle Ceesay to any such interview. More specifically, the government argues that under section 241.4, an informal interview is required only if supervision is revoked based on a violation of a condition of release. *See* Docket Item 9-3 at 9-11.

As an initial matter, the interpretation the government now proposes is contrary to ICE's explicit statement in Ceesay's February 2025 "Notice of Revocation of Release" that he would "promptly be afforded an informal interview" and "an opportunity to respond to the reasons for the revocation" of release. Docket Item 9-2 at 11. This suggests that the government's stance that no informal interview is required in Ceesay's situation is a "post hoc rationalization[] of past agency action" that should not be given deference. *See Lockheed Martin Corp. v. Morganti*, 412 F.3d 407, 411 (2d Cir. 2005).

Courts likewise have interpreted section 241.4(l) as requiring an informal interview upon the revocation of release regardless of the reason for the revocation. For instance, in *Doe v. Smith*, 2018 WL 4696748 (D. Mass. Oct. 1, 2018), the petitioner, like Ceesay, was taken into custody not based on the violation of a condition of release but based on the government's representation that it would be able to obtain travel documents from her home country in short order. *Id.* at *2. The court held that the informal interview requirement applied to the petitioner's detention, stating that section 241.4 "mandates that upon revocation of release, the petitioner must be given an initial

---

says that Ceesay's release was revoked because the government had "obtained a valid travel document to effect [his] repatriation"—a statement the government now has conceded was false. *See* Docket Item 9-3 at 5 n.4.

opportunity to dispute the government's justification for revocation." [24]  *Id.* at *7.  Other courts addressing the provision have interpreted it similarly.  *See M.Q. v. United States*, 2025 WL 965810, at *3, *5 n.1 (S.D.N.Y. Mar. 31, 2025) (noting that section 241.4(l) required ICE to provide petitioner with an informal interview after her order of supervision was revoked based on ICE's concededly false statement that it had obtained a travel document); *You v. Nielsen*, 321 F. Supp. 3d 451, 463 (S.D.N.Y. 2018) ("Even assuming arguendo that [r]espondents had the authority to revoke [p]etitioner's release under [section] 241.4 in May 2018, they could not detain him without providing him with notice and an informal interview.  *See generally* 8 C.F.R. § 241.4(l)." (italics omitted)); *Rombot*, 296 F. Supp. 3d at 387 ("Upon revocation, sections 241.4 and 241.13 both require ICE to provide 'an initial informal interview promptly . . . to afford the [noncitizen] an opportunity to respond to the reasons for revocation.'" (citations omitted)); *see also Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1019 (2025) (Sotomayer, J., statement respecting the Court's disposition of the application) (stating that "in order to revoke conditional release" under 8 C.F.R. § 241.4(l), "the [g]overnment must provide adequate notice and 'promptly' arrange an 'initial informal interview . . . to afford the [noncitizen] an opportunity to respond to the reasons for the revocation stated in the notification'").  Indeed, the government does not cite a single case holding that an informal interview is not required when release is revoked for a reason other than a violation. [25]  *See* Docket Item 19-6 at 20-21.

---

[24] The court nonetheless dismissed the petitioner's claim that her rights had been violated because it found that she had been afforded an informal interview as required by the regulations.  *Doe*, 2018 WL 4696748, at *7.

[25] The government suggests that subsections (l)(1) and (l)(2) provide two entirely different tracks for revocation.  *See* Docket Item 19-6 at 20.  But that does not make

Moreover, the third subsection—entitled "[t]iming of review when release is revoked"—suggests that noncitizens are entitled to an informal interview when their release is revoked regardless of the reason. *See* 8 C.F.R. § 241.4(l)(3). That subsection applies to all noncitizens whose release is revoked and provides that "if [the noncitizen] is not released from custody *following the informal interview provided for in paragraph (l)(1) of this section*," then "[t]he normal review process will commence." *Id.* Consistent with the caselaw cited above, and ICE's own interpretation noted above, that seems to imply that "the informal interview provided for in paragraph (l)(1) of this section" applies to all regardless of whether or not release is revoked for a violation.

The third subsection then says that the review process given to noncitizens who are not released begins with "a records review and scheduling of an interview, which will ordinarily be expected to occur within approximately three months after release is revoked." *Id.* Under the government's interpretation of the regulation, someone arrested based on the revocation of an order of supervision not related to a violation of conditions might spend three months or more in custody before getting *any* opportunity to contest the person's detention. So a noncitizen suspected of violating a condition of release gets more process than a noncitizen—like Ceesay—who has met his obligations to report. And someone arrested in error—perhaps a citizen mistaken for a noncitizen—might be jailed for months without any chance to contest the mistake. That cannot be—and is not—the law.

---

sense. After all, section 241.4(l)(2)(ii) provides as one of the possible reasons for revoking release that "[t]he [noncitizen] violates any condition of release," suggesting that the requirements under that subsection regarding which official has the authority to revoke release apply to noncitizens who have violated the terms of their release.

Therefore, consistent with the requirements of section 214.4, ICE was required to afford Ceesay at least an informal interview. And for two reasons, ICE's failure to afford Ceesay such an interview violated his right to due process.

First, "under deeply rooted principles of administrative law, not to mention common sense, government agencies are generally required to follow their own regulations." *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020); *see Torres-Jurado*, 2023 WL 7130898, at *2 ("Defendants cannot remove [a noncitizen] in any manner they please."). In *Accardi*, for instance, the Supreme Court reversed the dismissal of a habeas petition in which the petitioner alleged that the Board of Immigration Appeals had failed to follow its own regulations. 347 U.S. at 267. "[E]mphasizing that [it was] not . . . reviewing and reversing the manner in which discretion was exercised," the Court held that the petitioner was entitled to a hearing on "the Board's alleged failure to exercise its own discretion, contrary to existing valid regulations." *Id.* at 268. If he could prove that allegation, the Court held, the petitioner would be owed "a new hearing before the Board" under the proper procedures.[26]  *Id.*

---

[26] It is true that not every violation of an agency's rules necessarily requires a wholesale redoing of the agency action. *See Waldron*, 17 F.3d at 518 ("[W]here an INS regulation does not affect fundamental rights derived from the Constitution or a federal statute, . . . it is best to invalidate a challenged proceeding only upon a showing of prejudice to the rights sought to be protected by the subject regulation.")  But as noted above, the same is not true "when a regulation is promulgated to protect a fundamental right derived from the Constitution or a federal statute." *Id.*  There can be little argument that ICE's requirement that noncitizens be afforded an informal interview—arguably the most bare-bones form of an opportunity to be heard—derives from the fundamental constitutional guarantee of due process. *See Jimenez v. Cronen*, 317 F. Supp. 3d 626, 650 (D. Mass. 2018) (stating that "[section] 241.4 was intended to provide these [noncitizens] the procedural due process courts had found to be constitutionally required"); *see also Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) ("The fundamental

At least one court has found that ICE's failure to adhere to its own regulations may warrant the release of a detained noncitizen in circumstances like these. In *Rombat*, 296 F. Supp. 3d at 384, which involved a set of facts similar to those here, the petitioner "reported to the Manchester, New Hampshire[,] ICE office, as required by his Order of Supervision" when "[w]ithout advance notice, he was detained, placed in shackles, and later given a 'Notice of Revocation of Release.'" *Id.* at 385. After conducting a hearing, Judge Patti B. Saris found that there was no evidence that the detainee had been afforded the informal interview required by ICE's regulations or that the decision to revoke release was made by an official who was authorized to make it. *See id.* at 385-86. Because ICE had failed to follow its own regulations in detaining the petitioner, the court held that his detention was unlawful and ordered his release. *See id.* at 389 ("While ICE does have significant discretion to detain, release, or revoke aliens, the agency still must follow its own regulations, procedures, and prior written commitments.").

What is more, if ICE regulations and the enabling statutes did not afford a noncitizen the right to at least some sort of process promptly after being detained, that statutory and regulatory scheme would be unconstitutional. When someone's most basic right of freedom is taken away, that person is entitled to at least some minimal process; otherwise, we all are at risk to be detained—and perhaps deported—because someone in the government thinks we are not supposed to be here.

---

requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." (citation and internal quotation marks omitted)).

The government says that Ceesay's due process rights were not implicated by the revocation of his order of supervision. It says that Ceesay "already had extensive due process rights during his immigration removal proceedings" decades ago. Docket Item 19-6 at 6. And it says that no further process was due to him when the government revoked his order of supervision. *See id.* at 16. Indeed, it says, "[t]he Due Process Clause does not protect a 'benefit . . . if government officials may grant or deny it in their discretion.'" *Id.* (quoting *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005)). And it argues that the Second Circuit has "unequivocally concluded that '[a noncitizen] has no constitutionally-protected rights to discretionary relief or to be eligible for discretionary rights.'" *Id.* at 17 (quoting *Yuen Jin v. Mukasey*, 538 F.3d 143, 157 (2d Cir. 2008)).

The government's argument, however, confuses Ceesay's right to an order of supervision, which ICE indeed has discretion to grant or deny, with his right not to be detained without adequate—in fact, without *any*—process. The right to be free from detention can never be dismissed as discretionary. As the Supreme Court has stated, "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. And the cases cited by the government involve rights and privileges of an entirely different sort. *See Town of Castle Rock*, 545 U.S. at 766 (holding that plaintiff had no liberty or property right in police enforcement of a restraining order); *Yuen Jin*, 538 F.3d at 157 (holding that noncitizen who had "already filed one asylum application, been adjudicated removable and ordered deported, and who ha[d] nevertheless remained in the country illegally for several years, d[id] not have

a liberty or property interest in a discretionary grant of asylum"); *see also Oguejiofor v. Att'y Gen. of U.S.*, 277 F.3d 1305, 1309 (11th Cir. 2002) (involving discretionary relief related to immigration status).

It may be easy to say that we want noncitizens who are in this country illegally removed immediately. It may be popular to say that noncitizens who—at least allegedly—are members of violent gangs should be deported without a hearing. But how do we know that someone is who the arresting officers say he is? How do we know that a correctly identified noncitizen is a violent gang member and not a family man working hard to put food on the table of his wife and kids? How can anyone feel safe from being swept up and put in jail or deported simply based on being targeted by the government? More to the point: how can we pride ourselves on being a nation of laws if we are not willing to extend that most fundamental right to all—if we are not at least willing to ask, before we lock you up, do you have anything to say?

The answer is simple: due process. Everyone—citizen and noncitizen, the innocent and the guilty—is entitled to that sacred right. Ceesay did not get that here. And for that reason, even if ICE regulations did not give him the right to an informal interview, he still would be released.

In sum, because ICE did not follow its own regulations in deciding to re-detain Ceesay, his due process rights were violated, and he is entitled to release. And even if that were not so, he still would be released because he was not afforded even the minimal due process that protects everyone—citizens and noncitizens—in the United States.

### C.    Orderly Departure

Finally, Ceesay argues that he was entitled to an "orderly departure."    *See*
Docket Item 7 at ¶ 14; Docket Item 25 at 5, 10.    The basis for his claim is a statement in
the Release Notification issued to him in 2011 when he was released under an order of
supervision.    Docket Item 25 at 5.    That notification informed Ceesay that "ICE [would]
continue to make efforts to obtain a travel document that [would] allow the United States
. . . to carry out [his] removal."    Docket Item 9-2 at 7.    And it told Ceesay that "[o]nce a
travel document [wa]s obtained, [he would] be required to surrender to ICE for removal"
but that he would "at that time, be given an opportunity to prepare for an orderly
departure."    *Id.*

Ceesay says that an orderly departure means "advanced notice" of deportation,
and he asserted at oral argument that a period of 30 days would be "sufficient."    Docket
Item 27 at 10; *see* Docket Item 25 at 18-19 ("[A]n orderly departure provides an
individual with notice of their planned re-detention and removal from the United States
such that they can make preparations to organize their affairs.").    "For medically
disabled people like [himself]," Ceesay says, "this preparation is life-sustaining."    Docket
Item 25 at 19.    More specifically, Ceesay notes,

> In detention, [his] ability to coordinate his affairs is all but nonexistent.    By
> virtue of his incarceration, [he] is physically isolated from his medical
> support team. And because he must pay to make phone calls at BFDF and
> is currently indigent, . . . [he] is not able to speak with his doctors at the
> Jacobi Medical Center in the Bronx to coordinate a care plan.

*Id.* (internal citation omitted).    "BFDF is located hundred miles [sic] from [his] home,"
Ceesay says, "a home he left on February 19, 2025, without anything—not even his
medication—with the full expectation based upon the representations of the government
for 14 years[ ]that he would return to his home."    Docket Item 32 at 6.

The caselaw addressing a noncitizen's right to an orderly departure is sparse. Perhaps the seminal case recognizing such a right is *Ragbir v. Sessions*, 2018 WL 623557 (S.D.N.Y. Jan. 29, 2018), *vacated and remanded on other grounds sub nom. Ragbir v. Barr*, 2019 WL 6826008 (2d Cir. July 30, 2019).  In that case, the petitioner, Ravidath Ragbir, "was suddenly taken into custody" after "nine years [of] . . . reporting as required to immigration authorities" when his order of supervision was abruptly revoked "without further ado" and "without the freedom to say goodbye."  *Id.* at *1-2. That occurred despite the fact that—like Ceesay here—Ragbir had been given an order of release informing him that "[o]nce a travel document has been obtained, you will be required to surrender to ICE for removal.  You will, at that time, be given an opportunity to prepare for an orderly departure."  *Id.* at *2 n.9.

United States District Judge Katherine B. Forrest found that under those circumstances, Ragbir's release was warranted.  *Id.* at *3.  As she wrote:

> There is, and ought to be in this great country, the freedom to say goodbye. That is, the freedom to hug one's spouse and children, the freedom to organize the myriad of human affairs that collect over time.  It ought not to be—and it has never before been—that those who have lived without incident in this country for years are subjected to treatment we associate with regimes we revile as unjust, regimes where those who have long lived in a country may be taken without notice from streets, home, and work[ a]nd sent away.  We are not that country; and woe be the day that we become that country under a fiction that laws allow it.  We have a law higher than any that may be so interpreted—and that is our Constitution.

*Id.* at *1.  Thus, she held, "[c]onstitutional principles of due process and the avoidance of unnecessary cruelty here allow and provide for an orderly departure" and under those principles, Ragbir was "entitled to the freedom to say goodbye."  *Id.* at *3.

At least one other court also has found a right to an orderly departure when ICE first provides a formal notice that such will be provided.  In *Rombat*, the court held that

ICE "violated the Due Process Clause . . . when it detained" the petitioner, who had not

"violate[d] any condition of his release, but [nonetheless] was not given 'an opportunity

to prepare for an orderly departure' as specifically provided for in the Release

Notification" that ICE had given him. 296 F. Supp. 3d at 388. ICE entirely ignored its

earlier promise, the court found, when it "placed [the petitioner] in shackles . . . without

advance notice, a hearing, or an interview." *Id.*; *see also Rombot v. Moniz*, 299 F.

Supp. 3d 215, 217 (D. Mass. 2017) (finding that petitioner "was not given 'an

opportunity to prepare for an orderly departure' as promised by ICE").

By contrast, a court in the Western District of Washington held that the

petitioner did not have the right to an orderly departure of the kind recognized in *Ragbir*

because that petitioner's notice of release had not committed to providing him such a

departure. *Ahmad v. Whitaker*, 2018 WL 6928540, at *6 (W.D. Wash. Dec. 4, 2018),

*report and recommendation adopted*, 2019 WL 95571 (W.D. Wash. Jan. 3, 2019).

Because, unlike in *Ragbir*, "ICE [had] made no such promise to" the petitioner, the court

held, there was no basis to find that he had been denied a previously conferred right to

an orderly departure. *See id.*; *see also Doe*, 2018 WL 4696748, at *10 (assuming

without deciding that ICE violated petitioner's due process rights by failing to provide her

with an "orderly departure" as promised but finding that the remedy for such an injury

would be damages not release).

The government argues that "the concept of orderly departure is entirely

amorphous." Docket Item 29 at 3. Indeed, it notes, "[n]o statute or regulation defines

the term" and "[c]aselaw does not offer much clarity as to what [it] entails." *Id.* That is

doubtless true. Nonetheless, this Court—like the Court in *Ragbir*—finds it difficult to accept that because it is "amorphous," it must be meaningless.

The government cites *Ahmad* for the proposition that a right—or even a privilege—that is "so fragile as to turn on the inclusion (or not) of a sentence in a document" is no right at all. *Id.* at 4 (citing *Ahmad*, 2018 WL 6928540, at *6). Indeed, it says, "courts holding that language regarding 'orderly departure' entitles a foreign national to such process upon revocation of release" ignore "the fact that 'ruses and deception may be a perfectly valid tactic for law enforcement.'" *Id.* (quoting *United States v. Hardin*, 539 F.3d 404, 425 (6th Cir. 2008)). The government adds:

> Hypothetically, language regarding an "orderly departure" could be viewed as a ruse or deception to give foreign nationals a sense of security when appearing at check-ins, even if they may be subject to arrest and removal at that time. ICE's mandate is to remove people before they abscond and courts lack jurisdiction to second guess its tactics.

*Id.* at 5.

The Court finds that statement profoundly troubling. It is true, of course, that courts have upheld the right of law enforcement to employ "ruses" in certain contexts. In *Hardin*, for example, the Sixth Circuit noted that "in many circumstances (such as undercover activity designed to uncover illegal conspiracies and acts), ruses and deception may be a perfectly valid tactic for law enforcement." 539 F.3d at 425 n.12. "[I]n many circumstances." But not in all of them.

The government does not have carte blanche to enforce the law, even the immigration law, in any manner that it chooses, provided that at the end of the day it can say that those it calls criminals have been jailed and that those it deems deportable have been deported. In America, the government—including the courts—are constrained by the Constitution, not free to follow the Machiavellian maxim. ICE has the

power to execute removals, yes, but not in "any manner [that it] please[s]" so long as the ends justify the means. *See Torres-Jurado*, 2023 WL 7130898, at *2; *see also Rombat*, 296 F. Supp. 3d at 386-89.

Indeed, the situation presented here is something quite different from "undercover activity designed to uncover illegal conspiracies and acts" when deception might be warranted. *See Hardin*, 539 F.3d at 425 n.12. Noncitizens like Ceesay who are released on orders of supervision under section 241.4 necessarily have been found not to constitute either a danger to the community or a flight risk. *See* 8 C.F.R. § 241.4(d)-(f). Many, like Ceesay, are told to check in regularly with ICE officials and are explicitly told that their orders of removal remain in effect. *See* Docket Item 9-2 at 7; *see also Ragbir*, 2018 WL 623557, at *1. Some, like Ceesay, presumably report regularly without incident. *See* Docket Item 19 at ¶ 17; Docket Item 19-1 at ¶¶ 18-47; *see also Ragbir*, 2018 WL 623557, at *1 (noting that petitioner "report[ed] as required to immigration authorities" for nine years before his arrest). And still others are released because the government has been unable to effect their removal within the removal period, meaning that if they remained detained, that detention could violate the Constitution.

The idea that ICE would be justified in lying to such people about such a small but profound thing—the freedom to say goodbye, as Judge Forrest put it; the freedom to put a few photos of loved ones in your pocket, as this Court suggested at oral argument—boggles the mind. In such circumstances, a ruse disguised as a promise is not a tool for effective law enforcement—it is manifest cruelty. *See Ragbir*, 2018 WL 623557, at *3. "The Constitution commands better." *Id.*

48

That being said, this Court is conscious of its role, which is to interpret the law and to ensure that the executive branch does not exceed its authority or run afoul of the Constitution.  And just as the executive branch must not interfere with this Court's decision-making, this Court cannot tell the executive branch how to do its job, so long as it complies with the laws and regulations.  Here, the Court agrees with Ceesay that the promise of an orderly departure cannot mean nothing.  The Court finds that such a promise must include—at a minimum—the chance to make some preparations for serious healthcare concerns and perhaps the chance to pack certain belongings.[27]

Nonetheless, the Court agrees with the government that the promise of an "orderly departure" is amorphous and largely left to ICE to define.  *See* Docket Item 29 at 3; *see also Doe*, 2018 WL 4696748, at *10 ("It is . . . unclear what, exactly, constitutes an 'orderly departure,' or an 'opportunity to prepare' for such a departure.").  Indeed, the regulations themselves give ICE the discretionary power to revoke release, at least according to the procedures.  *See* 8 C.F.R. § 241.4(l)(2).

The government has asked this Court to specify whether "there are any time constraints on [Ceesay's] being taken back into custody by ICE."  Docket Item 33.  Based on the caselaw, the statutory and regulatory authority, and the record before it,

---

[27] As the Court observed at oral argument, finding no such right—especially in light of ICE's prior promise—could create serious substantive due process concerns.  *See* Docket Item 27 at 45-46 ("[S]uppose it's a diabetic who needs insulin to survive.  And let's say that diabetic needs insulin every 12 hours. . . . And if the diabetic doesn't get the insulin, the diabetic[ is going to] die.  . . . You can't put that diabetic on a plane for an 18-hour flight without insulin. . . . [T]hat[], at the very least, [would be] a due[ ]process violation."); *You*, 321 F. Supp. 3d at 457 ("[Government officials] are empowered to remove [p]etitioner at their discretion.  But they cannot do so in any manner they please. [They] could not, for example, execute removal by dropping [p]etitioner on a life raft in the middle of the Atlantic Ocean.").

this Court cannot say that there is a specific period of time that Ceesay must be allowed

to remain out of custody to prepare for an orderly departure. And while Ceesay has

asked for 30 days, he has no authority to support that request without ICE's

agreement.[28] In fact, as the government observes, it is not entirely clear that the

allowance for an "orderly departure" necessarily means a certain preparation period out

of custody. *See* Docket Item 29 at 5.

In sum, the government, having made a promise to Ceesay to provide him with

an "opportunity to prepare for an orderly departure," cannot now renege on the promise

such that its words meant nothing. The government therefore must give Ceesay that

opportunity, and its definition of "an orderly departure" must be reasonable. But unless

presented with facts that lead it to believe that the government has not followed this

Court's directive, the Court will not require more.[29]

## CONCLUSION

For the reasons explained above, the government's motion to dismiss the

amended petition is DENIED. Ceesay's petition is GRANTED in part and DENIED in

part. More specifically, within 24 hours of the issuance of this order, Ceesay must be

---

[28] ICE may of course choose to provide more time if it so chooses, but it is beyond this Court's power to prescribe a specific time period. See *Ahmad*, 2018 WL 6928540, at *6 ("ICE could have taken a number of other courses of action that would have lessened the blow of Mr. Ahmad's removal on him and his family.").

[29] What this Court can—and will—do is urge the government to work with Ceesay's counsel to reach agreement on a plan that will allow Ceesay the "opportunity to prepare for an orderly departure." Perhaps there are conditions, such as electronic monitoring, under which Ceesay could be released that would mitigate the government's concerns.

released to a public place[30] under the conditions of his order of supervision, and he must be afforded the "opportunity to prepare for an orderly departure" promised in his Release Notification.

The government has advised that Ceesay will be deported on May 7, 2025. Docket Item 35.  The Court will hold a status conference on Monday, May 5, 2025, where the government shall confirm, and provide the Court with details of, its compliance with this order.

SO ORDERED.

Dated:  May 2, 2025
           Buffalo, New York


                                          */s/ Lawrence J. Vilardo*
                                          LAWRENCE J. VILARDO
                                          UNITED STATES DISTRICT JUDGE

---

[30] The Court sees no reason to order that such public place must not be on federal property.  *See* Docket Item 33.